THE CITY OF CHICAGO, Plaintiff-Appellee, *v.* COSMOPOLITAN NATIONAL BANK OF CHICAGO, Trustee, *et al.*, Defendants-Appellants.

First District (4th Division)   No. 78-1474

Opinion filed September 27, 1979.

William Henning Rubin, of Chicago, for appellants.

William R. Quinlan, Corporation Counsel, of Chicago (Robert R. Retke and Edmund Hatfield, Assistant Corporation Counsel, of counsel), for appellee.

Mr. JUSTICE ROMITI delivered the opinion of the court:

The defendants' rental property was placed in receivership after a finding that it was in a dangerous and unsafe condition. The defendants appealed, contending that the order was improper, against the weight of the evidence and unconstitutional. They have also, in their brief and by various motions, complained of the receiver's acts or failure to act since his appointment and sought to have him dismissed. Finally they complain of the trial court's refusal to permit a supersedeas bond and have sought, in this court, to have the appointment stayed pending the appeal. We affirm the trial court's appointment of a receiver, and refusal to permit a supersedeas bond as being proper exercises of discretion. We rule that we have no jurisdiction to consider either the defendants' motion to have the appointment vacated or events occurring after the appeal.

The city of Chicago on August 3, 1978, filed an action against the defendants because of various violations of the Municipal Code. In count I the city charged that the defendants—the trustee, the owners, the managing agents, and others with a financial interest in the subject premises—had failed to maintain facilities and equipment, such as kitchens and stoves, in a safe and sound working condition, in violation of section 78—17.9 of the Municipal Code of Chicago, Illinois. It also charged that the defendants had failed to provide an adequate supply of hot water with a minimum temperature of 120 degrees F., in violation of section 78—13.11 of the Municipal Code. Count I prayed for the

imposition of a fine upon the defendants for each day the violations continued.

Count II alleged that the commissioner of buildings of the city of Chicago had determined that the said building was in a dangerous and unsafe condition and that a fine would be inadequate to effectuate the abatement of the nuisances; it prayed for the entry of temporary and permanent injunctions and for the appointment of a receiver.

Special service of summons was made on the defendant trustee, Cosmopolitan National Bank of Chicago, on August 3, 1978. The summons announced that the case would be tried at 11 a.m. on August 4, 1978. Special service of the same summons was also effected on the defendant managing agent, Coates & Miller.

The attorney for defendant Coates & Miller appeared at the August 4 hearing and, having asked for and received a 10-minute continuance in which to file his appearance, did so. He made no objection to the fact that his client had been served only the day before. When the city at the August 4 hearing filed another motion (separate from that in count II of the complaint) for the appointment of a receiver, defense counsel did object to that motion on the grounds he had not received 48 hours' notice. This objection was overruled on the grounds the order was in the nature of a temporary restraining order.

Both parties presented evidence at the August 4 hearing. The first witness for the city was Edward R. Gordon, a tenant in the subject premises. He stated there were 15 other families living in the building. Gordon identified a number of photographs of the subject premises that had been taken in his presence by one Terry Rufus, as truly and accurately reflecting conditions existing at the time they were taken. The photographs showed the frame of a back door not intact, several broken windows, deteriorating plaster, a broken board on a second-floor landing, missing bannisters, a bathroom with deteriorating plaster around the sink, deteriorating plaster on a ceiling, plaster missing on a wall near a sink, plaster completely missing from a ceiling, tile missing from a bathroom in a burned-out apartment, the deteriorating ceiling of the same burned-out apartment, the destroyed floor of the same burned-out apartment, debris, a rat hole and water draining into a pan from the sink in the witness' kitchen. Counsel for the city supplied the information that the pictures were taken on July 24, 1978.

Plaintiff's photographic exhibits were admitted into evidence over objection.

The next witness for the city was Tony DeLucio, a special account representative employed by the Peoples Gas, Light and Coke Company. He stated that the gas company had records, kept in the ordinary course of business, relating to the building at 334 to 346 North Mason, also known as 5945 West Lake Street. The records showed that gas was being

provided there for cooking only. Previously, gas had been supplied for hot water and heat, but the gas company discontinued such service on July 24, 1978. The building's gas meter was removed on that date because of past-due gas bills in the amount of $17,257.50.

Levi Washington, a code enforcement building inspector employed by the city of Chicago, was the third witness for the city. He testified that plaintiff's exhibits each depicted building code violations.

On cross-examination, Washington admitted that when he was there on the day before the hearing, someone was working on the porches.

Vera Allen, a tenant in the subject premises, also testified for the city. She stated that as she was opening a screen door on the premises a glass window fell out and hit her. She also said that the water in her apartment was hot in the morning but cooler later in the day and that it was not hot enough to take a bath in.

The defense called two witnesses. The first was Harrison Daniels. Without stating in what capacity he became informed of the substance of his testimony, he stated that the porches of the subject premises were in the process of being repaired, that a carpenter was working there, and that there was hot water in the building.

On cross-examination, Daniels said that the carpenter was employed by Coates & Miller to repair the back porches, that the carpenter was also doing work on the inside, that he had inspected the carpenter's work, that it was done in a workmanlike manner, that they were permit repairs, that the carpenter would also repair the interior staircases, that the carpenter had a helper, that the carpenter's name was Radolk, that he was a "general all around" worker, that he did plumbing as well as carpentry, and that he was going to fix the front door too. Daniels also testified that he had employed a Kenneth Moore to do some plastering and that Moore was going to do the job on the coming Saturday. Daniels said those workers did not have written contracts. Daniels admitted that he did not yet have a price on the job, saying that he first wanted to see if it was done correctly. He said Moore had been hired only for one job on the first floor.

On redirect examination, Daniels was shown the plaintiff's photographic exhibits and he expressed the opinion that the deterioration shown was the result of vandalism. Daniels testified that the burned-out apartment was unoccupied.

Robert Lark, the janitor of the subject premises, also testified for the defendants. He stated that there was hot water in the building.

On cross-examination, Lark stated that "there had been hot water all along except for a day or so" seven days before. At that time, he said "there was some repairs there for the gas." Then Lark admitted that gas was getting into the hot water heater through the meter in his own apartment. At the time of the hearing that arrangement had been in effect

for about a week. Lark also admitted that since July 26, 1978, he had not made any deposit with the gas company.

The defendants thereupon rested.

In rebuttal, the city recalled Tony DeLucio, the special account representative of the gas company. DeLucio stated that the gas company was aware that gas to the hot water heater was being channeled through a cooking meter in Lark's apartment. The special account representative of the gas company testified, over defendants' objection:

> "The gas company feels it has a potentially hazardous condition of supplying a building, approximately twenty-one apartments, through a home water * * * meter that is not designed for that purpose."

DeLucio stated that as a special account representative, it was his duty to familiarize himself with the billings and payments of a customer's account, that he also had to be familiar with the meters, their size and what use they were designed for. It was also his duty to make recommendations to the company regarding action against accounts he had under review.

The witness testified that he was familiar with the account of 334 North Mason and that his initial reaction to it was to send a letter to Lark requesting access to inspect the piping work on the premises to see if it was installed properly, and to offer to install a larger meter to make it safe. To accomplish this, DeLucio explained, Lark would be required to pay a largely increased additional deposit. The company had requested Lark to put up a deposit in the amount of $3,400. Lark would also be required to sign a guarantee making himself responsible for supplying hot water to the entire building. But Lark had not signed such a guarantee, nor provided access, nor given a $3,400 security deposit.

DeLucio declared he was familiar with the capacity of various gas meters. Over the objection of counsel for the defendants, DeLucio stated it as his expert opinion, based on his experience and knowledge, that the size of the meter being used to supply hot water to the subject premises was unsafe. The witness termed this condition a "poor supply of gas," which meant that the meter could not handle the supply of gas that is demanded of it. DeLucio gave his expert opinion that if a hot water heater had a poor supply of gas and the water was hot in the morning and lukewarm to cool in the afternoon, that condition would be caused by the poor supply of gas.

DeLucio testified that this poor supply of gas created a dangerous condition. The demand would be so great that the meter could not keep up with it and the pilot light would go out. There would also be a possibility that the supply coming into the building would not be large enough to handle the load.

On re-cross-examination, DeLucio admitted that he had not been in the building personally in the last three months. But on re-redirect examination, DeLucio explained that his knowledge about conditions at 334 North Mason had been obtained from company records of which he was the keeper.

The city then rested.

Defense counsel then moved that the matter be continued for one week, during which time the carpenter would complete his work. Counsel announced that his client, the managing agent, was shutting down the building, giving all the tenants notice to move out. A contract had been entered into for the installation of individual boilers in each apartment. If a tenant wanted to stay and pay his own fuel bills, he could, otherwise he would have to move out.

The court denied the motion for a continuance, stating that it had heard the evidence. After oral argument by both counsel, the trial court found:

> "In my opinion, this building is in dilapidated condition, a terrible state of repairs. It appears there has been nothing done. There is a hot water problem. I think there is a dangerous situation."

The court for this reason appointed a receiver, and waived bond. Nothing in the record indicates that defendant objected to the waiver of the bond. The receiver was required to insure the property.

At the request of defense counsel, the court set an appeal cost bond to cover the costs of the appeal. The defendants appealed on August 7, 1978, from the order appointing a receiver, from the order the receiver was not required to file any bond, and declaring the building is in a dangerous and unsafe condition and that defendants had refused to maintain the required minimum standard of health and safety.

■■ The filing of an appeal cost bond does not stay the proceedings below or deprive the receiver of his power to act. Apparently, sometime subsequent to the appeal the defendants moved in the trial court for a stay pending the appeal—the motion does not appear in the record. This was denied on October 13, 1978. Subsequently, the defendants asked this court to stay or vacate the order appointing the receiver. This petition was denied.

■■ ■ Finally, at oral argument, the defendants asked leave to file excerpts of record. Objection was made because the motion was untimely, because no designation of excerpts was filed and thus appellee was given no opportunity to designate excerpts, notice was given only just before oral argument was scheduled, the excerpts tendered were "woefully deficient" and apparently two thirds of the excerpts pertained to matters occurring after the filing of the notice of appeal. The motion was taken by this court under advisement. Without considering the other

objections raised by the plaintiff, we deny the defendants' motion on the grounds the major part of the excerpts pertain to matters not properly before the court since they occurred after the notice of appeal was filed. The only question before the reviewing court on an interlocutory appeal is whether there was a sufficient showing to sustain the order of the trial court granting or denying the relief sought (*S & F Corp. v. American Express Co.* (1978), 60 Ill. App. 3d 824, 377 N.E.2d 73), and the rights of the parties must be determined as of the time when the order was entered. (*John Deere Co. v. Hinrichs* (1962), 36 Ill. App. 2d 255, 183 N.E.2d 309.) Accordingly, we cannot consider evidence as to matters occurring after the filing of the notice.

## I.

■■ In the notice of appeal, the defendants appealed from the order that the receiver was not required to file a bond. The only reference made in the appellants' brief to the contention that the trial court erred in not requiring the receiver to file a bond is a simple statement that the order was invalid because no bond was posted. The defendants cite no authority in their brief to prove that a bond was required. Likewise they do not argue that such bond could not be waived by the court, or that the court's waiver in this case was improper nor do they cite any authority for such propositions. Since the defendants have cited no authorities nor made any argument in support of their contentions that the order was invalid because no bond was required, that issue is waived. *Flynn v. Vancil* (1968), 41 Ill. 2d 236, 242 N.E.2d 237; *Haas v. Buick Motor Division* (1959), 20 Ill. App. 2d 448, 156 N.E.2d 263; 3 Ill. L. & Prac. *Appeal & Error* §852 (1953).

## II.

Because of the rambling nature of the defendants' brief, it is difficult to determine precisely what issues they are attempting to raise for this court's consideration. Being guided by the points and authorities, however, we conclude that their contentions are: (A) that a receiver was improperly appointed since one can only be appointed as an ancillary remedy and not as a means to an end; (B) the appointment of the receiver, refusal to discharge him and refusal to allow the defendants to make repairs were denials of due process; (C) the court was obligated to dismiss the receiver since pictures taken after the receiver was appointed show that the porch and interior stair system had been fully repaired; (D) the refusal of the trial court and the appellate court to accept the appeal bond as a supersedeas bond was reversible error.

## A. and B.

■■ Neither of the first two contentions was raised in the trial court; accordingly neither is properly before us now. (*Van Meter v. Stout* (1970), 45 Ill. 2d 7, 256 N.E.2d 784; *Stone v. Stone* (1971), 1 Ill. App. 3d 806, 275 N.E.2d 205.) Furthermore, both the power of the court to appoint a receiver where an owner has violated the housing code and the constitutionality of the appointment were settled by our supreme court in *Community Renewal Foundation, Inc. v. Chicago Title & Trust Co.* (1970), 44 Ill. 2d 284, 255 N.E.2d 908, that court remarking at 44 Ill. 2d 284, 291, 255 N.E.2d 908, 913:

> ""We regard the appointment of a receiver to obtain compliance with the building codes, where because of continuing violations the property has become unsafe and a danger to the community, as within the inherent powers of an equity court. (See 45 Am. Jur., Receivers, 830-32, 842; Clark, Law of Receivers, §46.) Too, the providing of adequate housing accommodations is a problem of first importance and urgency for the cities. The appointment of a receiver when necessary to preserve and restore residential property is also obviously in the public interest and under circumstances appearing here was an appropriate exercise of a court's equity powers. Clark, Law of Receivers, §49; 45 Am. Jur., Receivers, 830 *et seq.*; 75 C.J.S., Receivers, 3 *et seq.*; see also Enforcement of Municipal Housing Codes, 78 Harv. L. Rev. 801, 826 (1965)."

■■ The defendants' repeated complaint in their brief that the appointment of the receiver was made without notice to the defendants is without merit. Count II of the city's complaint, which was served one day before the hearing, clearly requested the appointment of a receiver. Counsel's filing of a general appearance without any objection to the timing of the notice waived any contention that he did not have sufficient time in which to prepare his case.

## C.

The defendants' contention that the trial court has improperly maintained the receivership since the photographs taken by the defendants after the receiver was appointed show that the porches and interior stair system have been repaired cannot be considered by the court since, as we have already stated, we may not consider matters rising after the date of the appeal. For the same reason, the conduct of the receiver is irrelevant. Of course these matters may be presented to and considered by the trial court in appropriate future proceedings.

## D.

■■■ The defendants' last complaint is that both the trial court and this

court erred in refusing to stay the proceedings. Under Supreme Court Rule 305(b) (Ill. Rev. Stat. 1977, ch. 110A, par. 305(b)), either the trial court or the appellate court may in its discretion grant a stay pending the appeal of an interlocutory order but it is not required to do so. The fact that the appellant offers to file a bond is not sufficient reason in itself to mandate the granting of a stay pending the appeal of an interlocutory order. (*Engles v. Rosenthal* (1934), 274 Ill. App. 272.) Rather, as stated in *Engles,* such discretionary power should only be exercised in a case where it is clearly disclosed from the record that the trial court erred in the entry of the order and damage will result to the complaining party because of its entry before there can be a hearing on the merits of the appeal in the usual course. Supreme Court Rule 307 (Ill. Rev. Stat. 1977, ch. 110A, par. 307) provides for an expedited appeal. While there was considerable delay in the case between the filing of the notice of appeal and oral argument, we note that much of the delay was caused by the defendants.

The trial court's refusal to stay the proceedings was not a clear abuse of discretion. There was no clear showing that the order appointing the receiver was erroneous or that the defendants would be irreparably injured by the receivership. As we have already noted, the defendants neither objected to the trial court's failure to require the receiver to approve a bond nor did they pursue the issue on appeal. Likewise, the defendants never objected to the city's failure to file a bond before seeking to have a receiver appointed although such a bond apparently is required by section 1 of "An Act concerning the appointment and discharge of receivers" (Ill. Rev. Stat. 1977, ch. 110, par. 407), and would have protected the defendants from any damages sustained in the event the appointment was revoked or set aside. *Steinwart v. Susman* (1968), 94 Ill. App. 2d 471, 238 N.E.2d 200.

On the other hand, a stay of the proceedings could have caused serious injury to the tenants. They were threatened with the loss of hot water and possibly even of heat, not to mention the other unsafe conditions described at the hearing.

### III.

■■ There was ample testimony before the trial court to establish that the defendants were guilty of multiple housing code violations, and that these violations gave rise to a dangerous condition which should be remedied immediately. While some of this evidence was contradicted by the testimony of the defendants' witnesses, it was for the trial court as the trier of fact to resolve the conflict. (*Salem National Bank v. Chapman* (1978), 64 Ill. App. 3d 625, 381 N.E.2d 741; *Clifton v. Nardi* (1978), 65 Ill. App. 3d 344, 382 N.E.2d 514; *Jacobsen v. National Bank* (1978), 65 Ill. App. 3d 455,

382 N.E.2d 277.) Receivership was properly ordered as being part of the inherent powers of the court and as ancillary to the proceeding by the city to have the property either repaired or demolished. Notice was properly given. The defendants were afforded full opportunity to present any evidence desired. We find no error.

Accordingly, the judgment of the trial court is affirmed.

Affirmed.

JOHNSON and LINN, JJ., concur.