JOYCE ANN MURPHY, Plaintiff-Appellant and Appellee, *v.* MARILYN URSO, d/b/a Edgewater Preschool, *et al.*, Defendants-Appellees.—(THE TRAVELER'S INDEMNITY CO. OF ILLINOIS, Garnishee-Defendant-Appellee and Appellant.)

First District (4th Division)   Nos. 77-843, 77-1408 cons.

Opinion filed March 6, 1980.—Rehearings denied April 15, 1980, and May 14, 1980.

JIGANTI, J., dissenting.

George T. Murphy, Jr., and Frank J. Mackey, Jr., both of Chicago (Sidney Z. Karasik, of counsel), for appellant Joyce Ann Murphy.

Baker & McKenzie, of Chicago (Francis D. Morrissey and Norman J. Barry, Jr., of counsel), for appellant The Traveler's Indemnity Co. of Illinois.

Maddux, Johnson & Cusack, Ltd., of Chicago (Thomas H. Fegan, of counsel), for appellees.

Mr. JUSTICE ROMITI delivered the opinion of the court:
This case actually consists of two separate cases consolidated during proceedings in the lower court. The first is a suit against certain parties alleging that on theories of agency and negligent entrustment they are

liable for the actions of a driver who caused an automobile accident. The trial court granted summary judgment for the defendants on the ground that any implied authorization had been terminated before the accident. The second case is a garnishment action against the first defendants' insurer to recover on the judgment against the driver; the insurer had refused to defend the action against the driver and a default judgment was entered. The trial court granted a judgment for the plaintiffs for the total amount of the tort judgment plus interest although the policy limits were considerably less. We reverse the judgment in the first case, finding that the evidence presented in the affidavits and depositions raises questions of fact to be determined. In the second case we affirm the trial court's ruling that the insurer, because of its failure to defend, is estopped to deny coverage and, accordingly, is liable on the judgment against the driver up to the policy limits of $100,000, plus interest on the total judgment until the amount owed by the insurer is paid, plus costs. We hold, however, that the plaintiff cannot sue for the amount of the judgment in excess of the policy limits absent an assignment from the insured.

For purposes of clarity and convenience, we will discuss the two cases separately.

## THE CASE AGAINST URSO AND EDGEWATER

Late in the evening of September 1, 1971, the defendant, Clancy, while driving a motorbus owned by Marilyn Urso and Edgewater Preschool and Primary School collided with some parked automobiles. Allegedly he was intoxicated at the time. The plaintiff, Joyce Murphy, who was a guest in the bus was injured in the collision. She sued Clancy, Urso and the school. Clancy was served through the Secretary of State. He apparently left the State shortly after the accident and did not file an appearance in the case. A default was entered against him on March 11, 1975, in the amount of $750,000.

Murphy's claims against Urso and the school are based on the theories of agency and negligent or wilful and wanton entrustment. Both sides moved for summary judgment; the court denied the plaintiff's motion and granted the defendants' motion on the grounds that it was clear Clancy's employment had terminated prior to the occurrence and he had no implied authority.

In entering the order, the trial court had before it the affidavits and depositions of Urso, Joanne Chandler and Pamela Sabo and the affidavits of Thomas Coleman, Sue Tario, Joyce Murphy and her attorney, George Murphy.

Urso was one of the three stockholders of the school and its principal. In her affidavit she swore that Clancy had been discharged as an

employee of the school before the occurrence, that he had taken the vehicle without her consent, permission or knowledge and was using it for a purpose totally unrelated to its designated use to transport children attending the preschool nursery. Chandler's affidavit was to the same effect.

In her deposition, Urso stated: Clancy had been employed as a driver until the day before the accident. There were three runs: a morning run of two or 2½ hours, a run in the middle of the day and an evening run from 4:30-6:30 p.m. Otherwise the buses were kept at a Standard Service Station. The keys to the buses were kept in the office of the station when the buses were not in use, so that a substitute driver could drive the bus if needed. Moreover, the station required that the keys be accessible.

Clancy was fired on August 31 by Chandler at Urso's instructions because the fall enrollment was less than expected and they had had prior difficulty with his tardiness. When asked whether any notification was given to the Standard Station that he was not to have access to the bus anymore, she answered "No, no * * * by us, by me right. No. No." She did not know if he had taken the bus to the station after his last run on that date and then subsequently returned and retrieved it. The drivers were not permitted to use the buses for personal use, and as far as she knew Clancy had never done so prior to the accident. They never had problems with his being intoxicated.

In her deposition, Chandler stated: She was a director of the school at the time of the accident, her duties included hiring and firing. When Clancy was a driver for the school, he had a morning run (7-9 a.m.), a noon run (12-1:15) and two evening runs (3:30-5, 5-6:15). The buses were parked at a service station when not in use. The keys were left at the service station which was responsible for them. Prior to the accident she and Urso heard reports that Clancy had been using the bus late at night. They told him not to do so again. Urso, in Chandler's presence, also called the service station, and told them that at no time were any of the drivers to remove the buses from the premises, and all the buses should be parked there no later than 6:30 every evening.

Chandler knew of no other instances where drivers had used the buses without authority. Clancy was terminated by Chandler before noon on September 1, 1971. Clancy had failed to make the morning run. Chandler, therefore, asked Sabo to get in touch with Clancy and find out what had happened. Clancy came by at about noon. She told him that as far as she was concerned he was terminated then and there. Urso had not told Chandler to fire him, but Chandler had the authority to do so. She paid him by check. (This check was never produced.) The bus at that moment was at the service station; it had never been used that morning

and Chandler had called the station and been told the bus was there. She asked Clancy if he had the keys. He threw them on the desk and walked out. Chandler then told Urso what had happened. Urso told her to call the station and inform the station manager Clancy could not take a bus out. Chandler, however, did not state that she did, in fact, call the station.

Chandler, all that day, kept the keys Clancy had given her. As far as she knew this was the only set of keys. Moreover, as far as she knew, the bus was never used that day. No one took over as a bus driver because the runs were doubled up that day.

Chandler turned the keys over to Urso the next morning. After she heard of the accident, she never attempted to find out how Clancy was able to drive the vehicle without keys.

Chandler had recommended firing Clancy once before but was overruled by Urso on that occasion. Urso wrote on Clancy's termination card that he was terminated because of negligence and unreliableness.

Sabo in her affidavit swore in part:

1. that she had been a driver for the school on or about September 1, 1971;
2. that she was familiar with how the buses were used;
3. that prior to that date she and the other drivers used the buses after working hours for other than employment purposes;
4. that Urso had some knowledge of this and did not forbid their use;
5. that the drivers, including Sabo, usually did not park the buses in a regular location after working hours or surrender the keys;
6. that on July 15, 1971, Clancy had negligently caused a collision of the bus with another vehicle and that Urso had been informed of this.

In her deposition Sabo stated, in part: Until after the accident she was not told by the school what to do with the bus on weekdays after the day was completed, although she was told the bus was to be at the garage on weekends. Furthermore, during the day, between runs, the bus was hers to use. She either parked it near her apartment or used it for errands. Once she even went on an errand for Urso. Both Urso and Chandler knew she was using the bus for personal reasons. Chandler was very friendly with all of them and knew what was going on. One of them, Chandler or Urso, remarked if they were going to continue using the buses so much on their own, they (the drivers) would have to supply the gas on their own because she was not going to pay for all the gas they were using. Clancy always parked the bus near Sabo's apartment.

Sabo did not know if Clancy made the morning run on September 1, 1971. She knew he made the night run because they had been moving

stuff all day and they stopped to make the run. She did not actually see him drive the children but nothing out of the ordinary occurred. Her kids got on her bus and all the kids were put on buses.

Clancy's bus had been smashed up before, at the end of May. That was when he was high and could not remember what he had done with the bus. Sabo never saw him intoxicated with the children.

When the school hired Sabo they never examined her. She had no references. She also had no driver's license.

Coleman in his affidavit swore:

1. that several times prior to September 1, 1971, he spoke to Urso and Chandler who assured him he could have Clancy's job when Clancy left on September 15;
2. that on September 1, 1971, he saw Clancy at about 3:30 p.m. and at 5:30 p.m. driving the bus on his route;
3. that he arrived at the scene of the accident a few minutes after the accident occurred at which time Clancy said to him, "Here take the keys and take my place at the school tomorrow";
4. that on September 2, 1971, Urso, whose voice he recognized, called him and said "I suppose you heard about the accident. Will you take Clancy's place";
5. that he drove for the school from September 2 to December 29, 1971; that during the time he was permitted to keep the keys to the bus in his possession at all times and to use the bus for his own personal use which he did on many occasions; that Urso knew of this and in no way forbad it. Clancy had also used the bus for personal uses.

Tario in her affidavit swore:

1. that she was present at the scene of the accident and at that time Clancy attempted to give the keys of the bus to Coleman, and told him to take his (Clancy's) place at the school the next day;
2. that on September 1, 1971, she saw Clancy driving the school bus on his job at about 3:30 p.m.;
3. that both Clancy and Coleman, while drivers, used the school bus many times for personal uses including trips where she was a passenger. She also saw other drivers use the buses for personal uses.

None of the evidence in either Murphy deposition is pertinent to this appeal.

## I.

Upon motion by the defendants, the trial court struck many of the statements in the plaintiff's affidavits including those of Tario and

Coleman that Clancy tried to give the keys to Coleman, and that they had seen Clancy driving the school bus on his job the afternoon of September 1; the statement of Tario that Clancy had often used the bus for personal use; statements of Coleman and Sabo that while they acted as drivers for the school they used the buses for personal use, did not park them at the garage but kept the keys and that Urso was aware of this; and certain hearsay statements as to what Clancy had said. The defendants have attempted on appeal to defend the court's ruling on the grounds the statements were hearsay and conclusions. To a great extent we disagree.

■■■ Statements of Coleman, Sabo and Tario as to what Clancy said and offered as a proof of the matter asserted therein are, of course, inadmissible as hearsay (*Simon v. Plotkin* (1977), 50 Ill. App. 3d 603, 365 N.E.2d 1022; *Schultz v. American National Bank and Trust Co.* (1976), 40 Ill. App. 3d 800, 352 N.E.2d 310, *appeal denied* (1976), 64 Ill. 2d 598; *Goshey v. Dunlap* (1973), 16 Ill. App. 3d 29, 305 N.E.2d 648), unless some exception to the hearsay rule should be applicable. But the rest of the statements described above do not constitute hearsay. Coleman's and Sabo's descriptions as to their use of the buses are not conclusions but statements as to facts clearly within their knowledge. Whether their statements that Urso knew of the use were conclusions or statements of fact would depend on why they "knew" it. It appears from Sabo's deposition that she, at least, "knew" that Chandler and Urso were aware of the use because of statements they made to Sabo and the other drivers about paying for the gas. Accordingly, Sabo, at least, was competent to testify that they "knew" of the usage. Likewise, Coleman's and Tario's statements that Clancy had often used the bus for certain enumerated trips, all of which were personal uses and Sabo's that Clancy did not park the bus in a regular location after work and kept the keys were not conclusions but statements of fact based on personal knowledge.

Obviously, Coleman's and Tario's statements that they saw Clancy drive the bus on the afternoon of September 1 are admissible as statements of fact; whether their statements that he was driving it on the job are inadmissible depends on whether this was merely a shorthand method of saying that he was on the proper streets, school children were on the bus and were being picked up or discharged at the proper places or not. As stated in *State Farm Mutual Automobile Insurance Co. v. Short* (1970), 125 Ill. App. 2d 97, 104, 260 N.E.2d 415, 418:

> "With reference to subjects on which opinions are usually formed without analyzing the reasons for them or noticing their elements and where the witness is qualified to express such an opinion by reason of his special knowledge or familiarity with the matter in question, he will be permitted to give his conclusion. This reasoning would apply in a situation where a friend and neighbor

of a person is asked where another friend and neighbor resides. He would know that his friend lives across the street because he has special knowledge on this subject, but would not have paid particular attention to the various elements in his relationship with his neighbor which enabled him to form an opinion concerning his residence."

## II.

As we stated recently in *Cuthbert v. Stempin* (1979), 78 Ill. App. 3d 562, 396 N.E.2d 1197, a motion for summary judgment can only be granted where there are no genuine issues of material fact and the right of the moving party to judgment is clear and free from doubt.

Once ownership of an accident vehicle is shown, it is presumed that the driver of the vehicle was the employee or agent of the owner and was operating within the scope and authority of his employment or agency and with the owner's permission. (*McElroy v. Force* (1967), 38 Ill. 2d 528, 232 N.E.2d 708; *State Farm Mutual Automobile Insurance Co. v. Short* (1970), 125 Ill. App. 2d 97, 260 N.E.2d 415; 6C Appleman, Insurance Law and Practice §371 (1979).) This presumption was overcome by Urso's and Chandler's affidavits and depositions that Clancy's employment had been terminated prior to the accident and that they had not given him permission to drive the bus after that. *State Farm Mutual Automobile Insurance Co. v. Short* (1970), 125 Ill. App. 2d 97, 260 N.E.2d 415.

However, the depositions betrayed inconsistencies both within themselves and with each other. Chandler said that the bus was at the station when she fired Clancy and that the keys were left at the station when the bus was there, yet she asked Clancy for the keys and he gave them to her. Although she believed she had the only set of keys, she showed an amazing lack of interest in how Clancy could have taken the bus. She said she fired Clancy on September 1 because he did not show up for work, and that no one had instructed her to fire him. Urso said he was fired on August 31 at her instruction because they did not need a third driver and he was the least satisfactory. Likewise, their statements were contradicted by the statements in the depositions and affidavits offered by the plaintiff. Urso and Chandler both said that the buses were left at the station when not in use, the keys were left there and the buses were not used by the drivers for their personal use except for the one or two occasions by Clancy. This was contradicted by the other drivers who stated that not only were the vehicles used for personal use and not left at the station but that Urso and Chandler were aware of this. Clancy supposedly gave the only set of keys to Chandler yet he was seen driving the bus that afternoon and had the keys to it after the accident. Certainly a jury could, under these circumstances, refuse to believe Urso and

Chandler's claim that they had terminated Clancy's employment before the accident and revoked his authorization to use the bus. Under these circumstances summary judgment is inappropriate.

As the court stated in *State Farm Mutual Automobile Insurance Co. v. Short* (1970), 125 Ill. App. 2d 97, 107, 260 N.E.2d 415, 420, "[c]ourts cannot overestimate the importance of having the witness examined and cross-examined before the court and jury." Furthermore, it must be remembered that to the extent the claim is one for negligent entrustment, the defendants could be liable if they had failed to exercise reasonable efforts to void the possessive arrangement. *Ray v. Mays* (1967), 242 Ark. 79, 411 S.W.2d 865.

### III.

The defendants for the first time on appeal have contended that the plaintiff's claim for negligent entrustment was insufficient to state a cause of action at all since the guest statute applicable at the time of the accident (Ill. Rev. Stat. 1969, ch. 95½, par. 10—201), provided:

> "No person riding in or upon a motor vehicle or motorcycle as a guest without payment for such ride, or while engaged in a joint enterprise with the owner or driver of such motor vehicle or motorcycle, nor his personal representative in the event of the death of such guest, shall have a cause of action for damages against the driver or operator of such motor vehicle or motorcycle, or its owner or his employee or agent for injury, death or loss, in case of accident, unless such accident shall have been caused by the willful and wanton misconduct of the driver or operator of such motor vehicle or motorcycle or its owner or his employee or agent and unless such willful and wanton misconduct contributed to the injury, death or loss for which the action is brought.
>
> Nothing contained in this section shall be construed to relieve a motor vehicle or motorcycle carrier of passengers for hire of responsibility for injury or death sustained by any passenger for hire."

■■ While we agree that the complaint was inartfully drawn and might have been subject to a motion to dismiss, assuming that the plaintiff must prove the defendants guilty of wilful and wanton misconduct, we cannot agree that the complaint so totally failed to state a cause of action that the issue could be raised for the first time on appeal. (*Stogsdill v. Manor Convalescent Home, Inc.* (1976), 35 Ill. App. 3d 634, 343 N.E.2d 589; *Dunlap v. Marshall Field & Co.* (1975), 27 Ill. App. 3d 628, 327 N.E.2d 16; 2 Ill. L. & Prac. *Appeal and Error* §245 (1953).) Furthermore, we note that, in general, guest statutes have not been considered applicable to claims for negligent entrustment. (*Chapman v. Buder* (1968), 14 Mich.

App. 13, 165 N.W.2d 436, *appeal denied*; *Penton v. Favors* (1955), 262 Ala. 262, 78 So. 2d 278.) However, we do not rule on this issue since it was not adequately raised and argued by the parties.

## IV.

The plaintiff has urged that since the entire case is before us for review we reverse the trial court's refusal to grant her summary judgment and that we find the defendants liable as a matter of law.

■ The evidence raises questions of fact as to whether the vehicle was entrusted to the driver by the defendants or their agents and, if so, whether the defendants had sufficient knowledge or should have had sufficient knowledge of Clancy's driving and drinking habits (see Annot., 19 A.L.R. 3d 1175 *et seq.* (1968)), so that they could properly be held liable for such entrustment. Neither side is entitled to summary judgment.

### THE CASE AGAINST TRAVELERS INSURANCE COMPANY AND TRAVELER'S INDEMNITY CO.

Travelers Insurance Company and Traveler's Indemnity Co. (hereinafter called Travelers) issued a comprehensive automobile general liability policy to Edgewater Primary School, Inc. The automobile liability portion insured, among others, persons using an owned automobile (that is, one owned by the named insured) with the permission of the named insured. It also provided that the insurer had the right and duty to defend any suit against the insured seeking damages because of injury arising out of the use of any automobile. The policy limits were $100,000.

On August 10, 1972, the plaintiff Joyce Murphy filed suit against both James Clancy and Marilyn Urso, d/b/a Edgewater Preschool and Primary School, alleging that she had been injured as a result of Clancy's negligent and wilful and wanton conduct while operating the Urso vehicle, and that at the time of the accident Clancy was an agent or employee of Urso. Clancy had left Illinois after the accident and could not be personally served. He was served through the Secretary of State.

From the beginning, Travelers denied any liability to Clancy and refused to defend him in any way. Clancy himself filed no appearance or answer in the case. Accordingly, on March 11, 1975, a default judgment for $750,000 plus $95 costs was entered against Clancy. Over one year later Murphy amended the claim against Urso and the school, adding a claim for negligent entrustment.

On May 2, 1975, Murphy filed a garnishment action against Travelers to collect the judgment against Clancy. Travelers denied coverage, claiming Clancy had not been a permissive user. This action was delayed pending the determination of Urso's motion for summary judgment in the

tort action against her. On November 15, 1976, a year and a half after the garnishment action was filed, the trial court granted Urso's motion for summary judgment, finding that Clancy had been terminated prior to the action, and when he was terminated all implied authority ceased.

Both Murphy and Travelers moved for summary judgment in the garnishment action, Travelers arguing that the judgment for Urso and the school acted as *res judicata*. The trial court, on June 15, 1977, granted Murphy's motion. Although the policy limits were only $100,000, it awarded her $854,000, the total amount of the tort judgment plus accrued interest and costs.

The primary issue on appeal is whether Travelers can be held liable, as a matter of law, on the judgment against Clancy. Murphy argues that it can be held liable on the theory that it had a duty to defend Clancy and since it breached that duty it is estopped to deny liability for the judgment. Travelers denies that it is estopped, claiming that it had no duty to defend since there was a conflict of interest between it and Clancy. It further contends that it was entitled to judgment as a matter of law since the finding of the trial court in the underlying tort action against Urso that the use of the vehicle was unauthorized is controlling. Finally, it contends it cannot be held liable since Clancy chose to flee the jurisdiction and ignore the Murphy suit. The second issue is whether, if Travelers is liable, it can be held liable to Murphy for more than the amount of its policy limits.

I.

A.

As we recently stated in *Reis v. Aetna Casualty & Surety Co.* (1979), 69 Ill. App. 3d 777, 387 N.E.2d 700, it is well established in Illinois (*Sims v. Illinois National Casualty Co.* (1963), 43 Ill. App. 2d 184, 193 N.E.2d 123), that where there is potential coverage so that the insurer has a duty to defend but the insurer believes that in fact no coverage exists it must (1) either secure a declaratory judgment as to its rights and obligations before or pending the trial of the original tort action or (2) defend the tort action under a reservation of rights. If it does neither but simply refuses to defend, it is estopped, because of its breach of contract, from disputing any question of coverage in any later action against it on the policy.

When the complaint alleges, as this one did, that the driver was driving a vehicle for which the insurer in question issued an insurance policy which was in force at the time of the accident, the driver is a potential insured since he is, absent some policy exclusion, insured if he had permission to drive the vehicle or if the vehicle had been loaned to another bailee. Accordingly, since potential coverage exists, the insurer of

the vehicle is required to defend the suit against the driver (*Aetna Casualty & Surety Co. v. Coronet Insurance Co.* (1976), 44 Ill. App. 3d 744, 358 N.E.2d 914; *Country Mutual Insurance Co. v. Murray* (1968), 97 Ill. App. 2d 61, 239 N.E.2d 498), whether or not the plaintiff alleges that the vehicle was driven with permission. (*Country Mutual Insurance Co. v. Murray* (1968), 97 Ill. App. 2d 61, 239 N.E.2d 498.) Travelers does not dispute this but concedes that it is responsible for the costs of defense. What it contends is that following *Thornton v. Paul* (1978), 74 Ill. 2d 132, 384 N.E.2d 335, it should not be estopped to deny coverage although it failed to defend the action against Clancy. Indeed, it contends that following *Thornton* it could not have defended under a reservation of rights and that following *Maryland Casualty Co. v. Peppers* (1976), 64 Ill. 2d 187, 355 N.E.2d 24, it could not have sought a declaratory judgment as the issues in the underlying case were the same as they would have been in the declaratory judgment action.

*Thornton v. Paul* is in no way relevant to the instant case. In *Thornton*, the plaintiff sued the defendant for wilful and wanton misconduct, seeking both compensatory and punitive damages. The defendant had already been found guilty criminally of battery and fined. The insurer denied liability and refused to defend since intentional torts were not covered by the policy. The plaintiff later amended the complaint to allege negligence but the insurer reaffirmed its refusal to defend. Thereafter, the plaintiff and defendant agreed that in return for the payment of $100, the plaintiff would seek to collect any judgment obtained only against the insurer. This agreement was not disclosed either to the insurer or to the court. Furthermore, when the plaintiff obtained a default judgment against the defendant, no notice was given the insurer. The Illinois Supreme Court pointed out that the insurer could not have defended the action against the insured since there was a serious conflict of interest between them. This conflict existed in the fact that the issue in the tort case was whether the insured was guilty of a battery. Unlike the usual tort case, the insurer's interest in *Thornton* did not necessarily lie in a finding of not guilty as it would have been just as well served by a finding in the tort action that the insured was in fact guilty of committing a battery. The court also pointed out that a declaratory judgment action would have been inappropriate since the issue, whether the insured had committed a battery, was precisely the same issue as that in the tort action. For all of these reasons the court refused to find the insurer in *Thornton* estopped to deny coverage although it refused to defend. However, it carefully noted that: "Our holding in this case is not a repudiation of the holding of *Sims*, but is a narrow exception to that holding applicable only under conditions such as are presented in the present case." 74 Ill. 2d 132, 159, 384 N.E.2d 335, 346.

It appears from Travelers' brief that it is contending that a fatal conflict of interest existed because (1) it was denying coverage; (2) the insurer's interest lay in proving that Clancy was unlawfully in possession whereas Clancy's interests rested in showing he was driving with permission; (3) the claims against Clancy and Urso created a conflict of interest; (4) if Travelers had defended Clancy the impact on Urso could have been severe as Urso would have been personally liable for the excess judgment.

It is clear from *Thornton* that a mere denial of liability does not, in itself, create such a conflict as to excuse the insurer from conducting the tort defense. Were we to so rule, we would be overturning the estoppel rule laid down in *Sims* which the Illinois Supreme Court in *Thornton* expressly stated it would not do. Rather, it seems clear that the "narrow exception" to the *Sims* rule laid down in *Thornton* is only applicable when the insurer's and the insured's interests in the conduct of the tort action are in serious conflict.

Travelers' contention that such conflict existed in this case is without merit. It is true that Travelers was claiming that Clancy was not a permissive user of the vehicle. But that question could only be an issue in a suit to determine rights under the policy; it was not a relevant question in the tort action since permission in no way affected the plaintiff's recovery rights for personal injury against Clancy. (*Country Mutual Insurance Co. v. Murray* (1968), 97 Ill. App. 2d 61, 239 N.E.2d 498.) The *only* relevant issues in the suit against Clancy would be whether Clancy was guilty of wilful and wanton conduct, and whether Murphy was guilty of contributory wilful and wanton conduct, especially since she had been drinking with Clancy and knew he had been drinking, and the extent of Murphy's injuries. As to these issues Travelers' interests were identical with those of Clancy. This is not a case like *Thornton* where the very defense relied on by the insurer was a material issue in the tort action.

Travelers' claim that it was excused from defending Clancy because of the conflict of interest between Clancy and Urso and the school is based on our recent decision in *Associated Indemnity Company v. Insurance Company of North America* (1979), 68 Ill. App. 3d 807, 386 N.E.2d 529, *appeal denied* (1979), 75 Ill. 2d 589. In *Associated*, the insurer while providing omnibus coverage to drivers of the insured vehicle, excluded from coverage "any person * * * with respect to operations performed by independent contractors for the Named Insured." The injured party sued the driver of the vehicle and the named insured as the driver's principal. The insurer claimed that the driver was an independent contractor and therefore excluded from coverage. We held in *Associated* that the insurer was obligated to defend the driver but was not required to conduct that litigation itself since one of the principal issues in *the tort*

*action against the named insured* was whether the driver was an agent of the named insured or an independent contractor and a determination of that issue would also determine the insurer's liability on the policy. Clearly, therefore, in that case a serious conflict of interest existed between the driver and the insurer who was defending the claim against the named insured.

In the instant case, the plaintiff, as in *Associated*, was seeking to recover against the named insured as the driver's principal. But unlike *Associated*, a determination that Clancy was not an agent of the named insured or had not been acting within the scope of his authority would in no way determine Travelers' liability for a judgment against Clancy. Travelers' liability for Clancy's acts depended on whether he was a permissive user covered by the omnibus clause, not on whether he was the agent of the named insured. As we discussed in Part B these two issues are in no way identical.

Travelers has attempted to show that such conflict existed because under the amended complaint Murphy also sought to recover against the named insureds for negligent entrustment. But the amended complaint was not filed until nearly four years after Travelers had refused to defend and over a year after the default judgment was entered. Since Travelers was estopped at the moment it wrongfully refused to defend (*Associated Indemnity Company v. Insurance Company of North America* (1979), 68 Ill. App. 3d 807, 386 N.E.2d 529, *appeal denied* (1979), 75 Ill. 2d 589, it can hardly rely on events occurring four years later to excuse its default particularly since the judgment against Clancy had already been entered. Accordingly, we need not determine whether had the original complaint against Urso and the school contained the claim for negligent entrustment Travelers would have been excused from conducting Clancy's defense.

Travelers' last argument is that "had Travelers defended both Urso and Clancy simultaneously, the practical impact upon Urso, the named insured, could have been severe. * * * If Travelers defended Clancy as a putative insured * * * and the damages awarded plaintiff exceeded the policy limits, defendant Urso would have been held personally liable for any judgment in excess of the policy limits." Travelers cites no authority for this argument, and we know of no case holding that an insurer is excused from defending an omnibus insured merely because the named insured is also a defendant and the recovery may exceed the policy limits. To the contrary, it is in such a case that an insurer's duty to properly handle both the defense and any settlement negotiations is particularly stringent. Moreover, far from being prejudiced by Travelers defense of Clancy, it would be more likely that the named insureds would have been benefited since the amount of the recovery against Clancy, if the case had been properly defended, would probably have been much less

(special damages according to the Travelers' own pleadings amounted to only $6500) if recovery had not been defeated altogether. Finally, Urso and the school could not be held liable for the excess judgment merely because Travelers defended both them and Clancy. They can only be held liable if Clancy was their agent or they were guilty of negligent entrustment.

### B.

Travelers' second contention is that it cannot be held liable on the policy because it was determined in the tort action on November 15, 1976, over four years after Travelers refused to defend and over 1½ years after the default judgment was entered, that any implied authorization had been terminated before the accident. This contention was answered in our recent decision of *Associated Indemnity Company v. Insurance Company of North America* (1979), 68 Ill. App. 3d 807, 822, 386 N.E.2d 529, 541, *appeal denied* (1979), 75 Ill. 2d 589, when we ruled that "when an insurance carrier wrongfully refuses to conduct an insured's defense, the carrier's liability, *at that time*, becomes fixed and certain," and that, therefore, the insurer could not escape being estopped from denying noncoverage merely because the litigation had been stayed pending the resolution of the driver's declaratory judgment action against the insurer. Indeed, in the present case, unlike *Associated*, the tort litigation was not stayed, but the so-called determination was not made until long after the judgment against Clancy had been entered.

Even if we were to ignore the effect of Travelers' refusal to defend, the trial court's determination that any implied authority was terminated before the accident is not controlling in the garnishment action. Before the doctrine of collateral estoppel can be applied, three essential elements must be present: (1) there must have been a final suit on the merits in the former action; (2) the party against whom the estoppel is asserted must have been a party or in privity with a party to the prior litigation; and (3) the issue decided in the prior adjudication must be identical with the issue presented in the case under review. *Hassett Storage Warehouse Inc. v. Board of Election Commissioners* (1979), 69 Ill. App. 3d 972, 387 N.E.2d 785.

There is no final judgment here since we have reversed the summary judgment and remanded the case for trial. Moreover, only one of the parties against whom the estoppel is asserted was a party to the prior determination. A holding that Travelers is not liable on the judgment against Clancy affects Clancy's rights as well as Murphy's unless we reach the absurd result of holding that Clancy could force the insurer to pay the judgment but Murphy cannot. But Clancy was not a party to the summary judgment proceeding. While he was a codefendant with Urso and the

school, he did not in that case litigate the issue whether he was authorized to drive the bus, and, for this reason, he could not be bound by any determination in the tort action that he had not been authorized. (*City of Burbank v. Glazer* (1979), 76 Ill. App. 3d 294, 395 N.E.2d 97.) Nor was Clancy in privity with Murphy so as to be bound by a finding against Murphy alone. *Walka Mountain Camp No. 565, Woodmen of the World, Inc. v. Hartford Accident & Indemnity Co.* (1966), 222 Ga. 249, 149 S.E.2d 365.

Finally, the doctrine of collateral estoppel cannot be applied since the issues in the two actions are not identical. The issues in the action against Urso and the school are whether Clancy was their agent and whether they had negligently entrusted the vehicle to him at the time of the accident. The only coverage question is whether Clancy is an omnibus insured. A person may be an omnibus insured in Illinois even though he was not an agent of the named insured and the vehicle had not been entrusted to him by the named insured at the time of the accident. Under Illinois law, once initial permission has been given by the named insured, coverage is final barring theft or the like, and any use while the vehicle remains in the permittee's possession is covered (*Maryland Casualty Co. v. Iowa National Mutual Insurance Co.* (1973), 54 Ill. 2d 333, 297 N.E.2d 163), until that permission is terminated, as for example when the keys to the car are returned to the insured. (*Burton v. Lee* (1976), 43 Ill. App. 3d 305, 356 N.E.2d 1310, but compare *United States Fidelity and Guaranty Co. v. McManus* (1975), 32 Ill. App. 3d 370, 336 N.E.2d 252, *aff'd* (1976), 64 Ill. 2d 239, 356 N.E.2d 78.) Furthermore, if the named insured had delegated permission to use the vehicle to the service station where it was supposedly parked (compare *Jordan v. Consolidated Mutual Insurance Co.* (1976), 59 Cal. App. 3d 26, 130 Cal. Rptr. 446), then it would be immaterial whether Clancy had permission to take the vehicle from the service station's premises, assuming that in fact he did. Once permission has been granted to a first permittee, a further grant of permission from the first permittee to the second user need not be shown and the operator is covered unless it can be shown that he obtained possession by a theft or tortious conversion. *(United States Fidelity & Guaranty Co. v. McManus* (1976), 64 Ill. 2d 239, 356 N.E.2d 78.) As we held in *United States Fidelity & Guaranty Co. v. McManus* (1975), 32 Ill. App. 3d 370, 336 N.E.2d 252, *aff'd* (1976), 64 Ill. 2d 239, 356 N.E.2d 78, merely retaking the keys to the car and using it at a subsequent date does not constitute such criminal conduct. Moreover, the operator may be covered even though the named insured told the first permittee not to allow the operator to drive the vehicle. *Maryland Casualty Co. v. Iowa National Mutual Insurance Co.* (1973), 54 Ill. 2d 333, 297 N.E.2d 163; *United States Fire Insurance Co. v.*

*Kendle* (1974), 23 Ill. App. 3d 531, 318 N.E.2d 644, *appeal denied* (1975), 57 Ill. 2d 610.

## C.

Travelers' final argument why it should not be held liable for any of the judgment against Clancy is that the garnishee cannot recover if the judgment debtor could not do so and Clancy clearly could not seek to enforce coverage since he chose to flee the jurisdiction and ignore the Murphy suit. This issue was not raised below and so cannot be raised on appeal. *City of Chicago v. Cosmopolitan National Bank* (1979), 77 Ill. App. 3d 212.

We are aware that the case at bar was decided on summary judgment. Nevertheless, when a motion for summary judgment is made, the opponent cannot sit quietly by but is required to raise any defenses and produce evidence tending to show a question of fact exists. (*Cuthbert v. Stempin* (1979), 78 Ill. App. 3d 562, 396 N.E.2d 1197.) The plaintiff was not required to prove that the insured cooperated with the insurer; rather, the burden was on Travelers to plead and prove that the insured had failed to cooperate with it (*M.F.A. Mutual Insurance Co. v. Cheek* (1977), 66 Ill. 2d 492, 363 N.E.2d 809; *Kress v. O'Hara* (1973), 14 Ill. App. 3d 54, 302 N.E.2d 123, *appeal denied* (1974), 55 Ill. 2d 602) and that this failure was material and prejudiced the insurer in defending the primary action. (*M.F.A. Mutual Insurance Co. v. Cheek* (1977), 66 Ill. 2d 492, 363 N.E.2d 809.) Moreover, where the insured fails to appear at trial, the insurer is required to prove that it acted in good faith to secure the attendance of its insured at trial and that insured's failure to appear was due to his refusal to cooperate. *Johnson v. Wade* (1977), 47 Ill. App. 3d 610, 365 N.E.2d 11; *Anderson v. Lawlor* (1975), 27 Ill. App. 3d 150, 326 N.E.2d 529; *Chertack v. Santangelo* (1972), 6 Ill. App. 3d 201, 285 N.E.2d 209.

In this case there was no evidence in the record tending to show the insurer had acted diligently and in good faith to secure Clancy's attendance at trial or that his failure to appear was caused by a refusal to cooperate rather than by simple ignorance of the suit or even death. In any event, since the insurer had already decided not to defend the action against Clancy, not because of any alleged failure to cooperate but because of the claimed defense of noncoverage, it cannot claim that Clancy's absence affected its defense of the tort action. Moreover, where the insurer disclaims liability and refuses to defend the tort action, lack of cooperation cannot be raised as a defense. (*Mayfair Construction Co., Inc. v. Security Insurance Co. of Hartford* (1977), 51 Ill. App. 3d 588, 366 N.E.2d 1020; 8 Appleman, Insurance Law and Practice §4786 (1962).) Clancy owed no duty to Travelers to defend the action when Travelers

failed to do so. *Mahon v. State Farm Mutual Automobile Insurance Co.* (1962), 36 Ill. App. 2d 368, 184 N.E.2d 718, *appeal denied* (1962), 25 Ill. 2d 623.

## II.

The remaining issue is for what amount is the insurer liable. The plaintiff contends Travelers is liable for the total tort judgment plus costs and interest; Travelers contends that it cannot be held liable to Murphy in excess of its policy limits of $100,000. Neither is correct.

As we held in *Reis v. Aetna Casualty & Surety Co.* (1978), 69 Ill. App. 3d 777, 387 N.E.2d 700, the mere failure to defend does not, in the absence of bad faith, render the insurer liable for that amount of the judgment in excess of the policy limits; accordingly Travelers can only be held liable in this action for $100,000 on the tort judgment. However, it is also liable for the costs awarded Murphy in the tort action even though the policy limits have been exhausted. (*Ravenswood Hospital v. Maryland Casualty Co.* (1917), 280 Ill. 103, 117 N.E. 485; *Bailes v. Casualty Reciprocal Exchange* (La. App. 1973), 279 So. 2d 255, *writ denied* (1973), 281 So. 2d 747; *Liberty National Insurance Co. v. Eberhart* (Alas. 1965), 398 P.2d 997.) Likewise Travelers is liable for the interest accruing on the total award until the amount owed by Travelers is paid. *River Valley Cartage Co. v. Hawkeye-Security Insurance Co.* (1959), 17 Ill. 2d 242, 161 N.E.2d 101; *Gass v. Carducci* (1964), 52 Ill. App. 2d 394, 203 N.E.2d 289.

Our holding does not mean that Travelers can under no circumstances be held liable for that part of the judgment in excess of policy limits. As we stated in *Reis*, if the insured can show that the excess judgment was entered because Travelers in bad faith refused to defend, or in bad faith or negligently failed to settle the claim or abandoned the defense, he may recover the total amount of the judgment against him. But the suit here was not brought by the insured; it was brought by the judgment creditor, and the judgment creditor has no standing to bring a suit to determine if the insurer should be held liable for the excess judgment absent an assignment from the insured or his trustee in bankruptcy. (*Yelm v. Country Mutual Insurance Co.* (1970), 123 Ill. App. 2d 401, 259 N.E.2d 83, *appeal denied* (1971), 44 Ill. 2d 586; *Smiley v. Manchester Insurance & Indemnity Co.* (1973), 13 Ill. App. 3d 809, 301 N.E.2d 19.) Furthermore, the present action was one in garnishment. Garnishment only lies where the claim sought to be garnisheed is due without contingency and liquidated and this excess judgment claim is not. (*Powell v. Prudence Mutual Casualty Co.* (1967), 88 Ill. App. 2d 343, 232 N.E.2d 155, *appeal denied* (1968), 37 Ill. 2d 627; 22A Appleman, Insurance Law and Practice §14565 (1979).) But nothing in this opinion should be construed as barring Clancy or his assignee from bringing an

action to determine if Travelers should be held liable for the amount of the excess judgment.

■■ To conclude, we agree with the trial court that Travelers is liable for the tort judgment up to the policy limits of $100,000 plus interest on the total judgment until paid and the costs awarded in the tort action since the insured is estopped to deny liability because it failed to defend. We reverse that portion of the judgment finding the insurer liable for the $650,000 excess judgment and modify the award accordingly.

Judgment in case 77-843 reversed and remanded for further proceedings in accordance with this opinion; judgment in case 77-1408 is modified and, as modified, affirmed.

Reversed and remanded in part; judgment modified and affirmed.

LINN, P. J., concurs.

Mr. JUSTICE JIGANTI, dissenting:

My disagreement with the majority concerns the applicability of the exception stated in *Thornton v. Paul* (1978), 74 Ill. 2d 132, 384 N.E.2d 335, to the general rule regarding the insurer's duty to defend. As stated by the majority, the general rule is that where there is potential coverage, as demonstrated by the allegations of the complaint, but the insurer believes that in fact no coverage exists, it must (1) defend the insured; (2) secure a declaratory judgment as to its rights and obligations; or (3) defend the tort action under a reservation of rights. (*Sims v. Illinois National Casualty Co.* (1963), 43 Ill. App. 2d 184, 193 N.E.2d 123.) An insurer who does none of these is estopped from later arguing policy defenses or noncoverage in a subsequent action by the insured or a judgment creditor. *Sims.*

The Illinois Supreme court in *Thornton* established a narrow exception to the general rule set forth in *Sims*. It stated:

> "Although the allegations of the complaint determine whether or not the insurer is obligated to provide a defense, when there is a conflict of interests, as in the present case, the insurer should not be obligated or permitted to participate in the defense of the case. Its obligation to provide a defense should be satisfied by reimbursing the insured for the costs of the defense." (74 Ill. 2d 132, 152.)

The *Thornton* court noted that where such a conflict exists, the insurer's failure to defend should not estop it from later raising the defense of noncoverage. In a conflict situation the insured has the right to be represented by counsel of his own choosing and the right to control his defense; the insurer's obligation to provide a defense should be satisfied by reimbursing the insured for his defense costs.

In the instant case the policy provided coverage to persons using an

automobile owned by and with the permission of the named insured. The original complaint alleged that Clancy was the agent of Urso, the named insured. In the amended complaint it was alternatively alleged that Clancy was Urso's agent or that Urso negligently entrusted the automobile to Clancy. Urso denied all these allegations and filed an affidavit in support of her motion for summary judgment denying agency and alleging that the vehicle was taken without her consent, permission or knowledge. Her affidavit also stated that the vehicle had been stolen.

The conflict of interest established by these allegations is patent and prevents Travelers from representing Clancy. Urso, the named insured, denies that Clancy was her agent and denies that Clancy had the vehicle with her consent, permission or knowledge. To be afforded coverage, Clancy must take a position totally contrary to Urso's position; he must contend he was her agent or a permissive user of the vehicle. The interest of Travelers would have been just as well served by a finding that Clancy was not a permissive user as it would have been by a finding that Clancy was not liable to the plaintiff. As explained in *Thornton* (74 Ill. 2d 132, 156), this obvious conflict prevents Travelers from either defending Clancy or defending under a reservation of rights, two of the three alternatives posed in *Sims*.

The last alternative allowed under *Sims* is an action in declaratory judgment. The court stated in *Thornton* that since the principles of collateral estoppel were applicable it did not believe that an issue crucial to the insured's liability should be determined in a declaratory judgment action, a purely ancillary proceeding. (74 Ill. 2d 132, 156-57.) The issue in a declaratory judgment proceeding would be whether Clancy was a permissive user of the vehicle. That is a crucial issue in the underlying personal injury action. In such an ancillary proceeding, as the *Thornton* court observed, the injured party would be the defendant rather than the plaintiff, and thus the burdens of proof and of going forward with the evidence would be reversed. (74 Ill. 2d 132, 158-59.) The *Thornton* court also observed that an advance determination of the matter of coverage is not desirable where that question is closely related and directly connected with the issue of the insured's personal liability to the injured party. (74 Ill. 2d 132, 157.) Although the issues in Murphy's underlying action, agency or negligent entrustment, and the declaratory judgment action, permissive use, are not precisely the same, they are closely and directly connected. In neither *Thornton* nor *Maryland Casualty Company v. Peppers* (1976), 64 Ill. 2d 187, 335 N.E.2d 24, was the issue in the declaratory judgment action precisely the same as that in the underlying tort action.

In my estimation, the *Thornton* exception is controlling and, therefore, Travelers should not be estopped from raising the defense of noncoverage.