(No. 48745.—

ILLINOIS INSTITUTE OF TECHNOLOGY, Appellee, v. THE INDUSTRIAL COMMISSION *et al.*—(Sonya Greenberg, Appellant.)

*Opinion filed Sept. 20, 1977.—Rehearing denied Nov. 23, 1977.*

Lewis P. Gaines, of Chicago, for appellant.

Klohr, Braun, Lynch & Smith, of Chicago (Mark A. Braun and James W. Ford, of counsel), for appellee.

MR. CHIEF JUSTICE WARD delivered the opinion of the court:

The claimant, Sonya Greenberg, filed an application for adjustment of claim under the Workmen's Occupational Diseases Act (Ill. Rev. Stat. 1969, ch. 48, pars. 172.36 through 172.62) which alleged that she was the widow of Carl J. Greenberg and that while employed by the respondent, the Illinois Institute of Technology's Research Institute (hereafter IIT), he was exposed to an

occupational disease hazard, atomic radiation, which resulted in his eventual disablement and death. An arbitrator for the Commission found that Greenberg was last exposed to the hazard on May 31, 1955, and that his death on June 24, 1970, resulted from this exposure. The arbitrator entered an award for the claimant under section 7(a) of the Workmen's Occupational Diseases Act (Ill. Rev. Stat. 1969, ch. 48, par. 172.42(a)), and the award was affirmed by the Commission. The respondent filed for a writ of *certiorari* in order to have the award reviewed by the circuit court of Cook County.

On March 7, 1975, the claimant filed a motion she styled "Misconception of Remedy" declaring that she was entitled to an award under the Workmen's Compensation Act rather than the Workmen's Occupational Diseases Act and asking the court to confirm the award under the provisions of the former act. (See Ill. Rev. Stat. 1969, ch. 48, pars. 138.19(a)(1) and 172.54.) The court simply set aside the award and remanded the cause to the Commission "for further hearings and decision pursuant to the terms and conditions of the applicable provisions of the Workmen's Compensation Act of Illinois."

On remand the Commission found that Carl J. Greenberg sustained an accidental injury arising out of and in the course of his employment with IIT when he was exposed to atomic radiation on May 31, 1955, that this exposure caused his death on June 24, 1970, and that the claimant was entitled to an award under section 7(a) of the Workmen's Compensation Act (Ill. Rev. Stat. 1969, ch. 48, par. 138.7(a)).

The deceased was hired by IIT in June of 1953 as an electrical engineer. In 1954 IIT contracted with a Federal agency to provide electrical communications equipment for use in the underwater detonation of an atomic bomb which was scheduled to take place in the spring of 1955. This project was designated "Operation Wigwam." Green-

berg helped to design and develop this electrical equipment, and in the spring of 1955 he and other IIT employees traveled to San Diego to install the equipment on the *U.S.S. Curtiss* and the barge from which the atomic bomb would be detonated. The *U.S.S. Curtiss* and several other ships left San Diego in the early part of May 1955, and on May 14 the bomb was exploded underwater in the Pacific Ocean in an area 2,000 feet below sea level. The *U.S.S. Curtiss* left the detonation area on May 15 and returned to San Diego on May 17.

John McManus, who had worked with Greenberg in 1955, testified that he helped him install the equipment on the ship and the barge while they were docked in San Diego. He stated that he was not present when the bomb was detonated and that radiation-monitoring equipment had been installed on the ship but that none had been installed on the barge, so far as he knew, while he was aboard.

Rune Fors, who also had worked with Greenberg, testified that his responsibility was to attach a doppler cable containing electrical equipment to the cable which was used to lower the bomb into the ocean. He stated that he worked next to the bomb, that the deceased worked on other projects and that the deceased may have worked in proximity to the bomb. He said, too, that he did not recall seeing any radiation-monitoring devices, that there was a sprinkling system on the ship which was to be used if the ship encountered fallout after the blast and that his ship was approximately 5 to 6 miles from the detonation site. On cross-examination he stated that he never worked directly with Greenberg and that the deceased was not with him while he worked next to the bomb. He identified the ship that he and Greenberg worked on as the *U.S.S. Curtiss* and said they had been at sea approximately a week. He said there was never any need to use the sprinkler system, that he did not know if there were any

radiation-monitoring devices on board the *Curtiss,* and that he never wore any sensitivity badges. James Bats testified he had worked on the project. He said he helped to attach the doppler cable and testified that he was not certain whether Greenberg had helped to attach the cable.

Dr. Steven Schwartz, who specializes in hematology (the study of the blood and blood-forming organs), testified for the claimant that he had examined Greenberg on February 7, 1966, and again on January 17, 1970. His diagnosis was lymphosarcoma, which he described as a "terminal disease." Asked the cause of this condition, he stated "I can't answer it [the question] because I don't know." It was his opinion that lymphosarcoma is an infectious disease, but he admitted that some physicians felt that the disease could be caused by radiation exposure.

Dr. Gerald Buckman, an internist, also was a witness for the claimant. He said he first saw Greenberg in January of 1966 and that he diagnosed his condition as either lymphosarcoma or chronic lymphocytic leukemia. He stated that lymphosarcoma is a disease that affects the lymph nodes, the lymphatic tissues of the spleen, the liver and bone marrow to such an extent that one becomes susceptible to infections. He said there were three different theories as to the cause of the disease: (1) radiation exposure, (2) viral infection, and (3) chromosomal abnormality. When asked by the claimant's attorney what in his opinion had caused the death of Greenberg he responded:

> "And I must admit I don't know [what caused the lymphosarcoma]. I think there is a possibility that it might have been due to radiation but I have no first hand way of knowing what the cause of his primary disease process was."

Asked whether in his opinion there was a causal connection between Greenberg's work on the atomic bomb project and his death he said:

> "I must say I really don't know. I don't know. First of all,

> I'm not an expert in this field. Secondly, I don't know whether there is any atomic radiation in the area. I would say there is a possibility in answer to your question but I really don't know."

Shortly thereafter he testified:

> "Actually from my understanding from what you've mentioned before there were no monitoring devices used so whether there was radiation or no radiation, I don't think can be proved anyway."

On cross-examination he stated again he was not an expert in radiation and that he had never specifically studied the effects of radiation. He said that Greenberg had told him in June of 1969 that he had been exposed to radiation in 1955 but that he did not personally know that Greenberg had been exposed. He said that in order for him to conclude that the lymphosarcoma was caused by radiation he had to assume that the deceased was exposed to excessive radiation.

Another witness for the claimant was Dr. Harold Schwartz, an associate professor of radiology at the Medical Center of Marquette University, who conducts research on the effects of radiation and teaches related courses in medical school. Responding to a hypothetical question, he stated that it was his opinion that Greenberg could have been exposed to radiation during Operation Wigwam. He based his opinion on a report entitled "Fall-Out And Airborne Activity in Operation Wigwam, With Notes on Surface Effects" (hereafter the Project 2.7 report), one of the several reports prepared from the data collected during Operation Wigwam. The report indicated that there was significant fallout "to have given radiation doses many times tolerance to exposed personnel located approximately five miles downwind." This report was incorporated into the hypothetical question. He said, too, that Greenberg could have been exposed to radiation when he came into contact with the bomb. (The record did not

contain evidence, however, that the deceased had come into contact with the bomb.)

On cross-examination he admitted that the encasement surrounding the bomb would decrease radiation. He also said that he did not know whether the deceased was upwind at the time of the blast, that the Project 2.7 report spoke of significant fallout downwind, that he did not know where the deceased was at the time of the blast and that it would make a substantial difference if the deceased was upwind at this time.

The arbitrator's finding was for the claimant. IIT sought a review of this finding and at a hearing before the Commission presented the testimony of Albert Baietti, a health physicist. This witness, who was certified by the American Board of Health Physicists, was in charge of the radiation-detection program for Operation Wigwam, and was co-author of a report entitled "Radiological Safety For Operation Wigwam" (hereafter the Project 0.17 report). Baietti said that as a health physicist his primary responsibility is to protect man and his environment from unnecessary radiation exposure. The witness stated that he was the director of the Health Physics Division of the Naval Radiological Defense Laboratory from 1950 to 1962 and that he had been involved in the testing of a dozen nuclear weapons during this period.

He testified that one of the primary ways of measuring radiation exposure is through the use of dosimetry films, also known as sensitivity badges. He said that in Operation Wigwam two types of film badges were used. "Operational" badges were issued to all personnel, including those aboard the *Curtiss* when the ships left San Diego. At the completion of the project the film was collected, processed and interpreted. "Daily" badges were issued to personnel involved in the recovery operation. This film was issued daily and collected, processed and interpreted at the end of the day so that the amount of radiation exposure, if

any, could be calculated. The witness was then handed a document entitled "Roster of Ship's Officers and Men and Radiological Dosages Received." The document contained the names of civilians, including that of the deceased, and indicated the radiation dosage they had received during Operation Wigwam. Asked to interpret the data in the document Baietti said: "He [the deceased], along with all others on this particular document, received zero radiation. This says the film badge that was worn and processed gave no evidence of any exposure to radiation."

Baietti stated that every ship involved in Operation Wigwam carried radiation-safety personnel, that all ships were equipped with radiation-detection devices and that no ship had reported the presence of any radioactivity. He said, too, that at the time of the detonation all personnel were on ships located "so as to be completely out of what was considered to be the radiological environment." He testified that all ships, except for two scheduled to be in the contamination area, were located upwind and that no ship was exposed to fallout. (The *U.S.S. Curtiss* was not one of the ships in the contamination area.) He testified that the *U.S.S. Wright,* a recovery vessel, was located closer to the detonation site than was the *Curtiss,* that it did not record any radiation above the normal background level during the test and that the *Curtiss* did not enter the recovery area. In his opinion, he testified, it was virtually impossible for Greenberg to have been exposed to radiation.

He testified that the Project 2.7 report's prime objective was to gather data so that in the future a fleet at sea might possibly know what to expect if it were attacked with nuclear weapons. He said that this report was not concerned with fleet maneuvers during Operation Wigwam, and that the report had nothing to do with the potential or actual exposure of personnel who were involved in Operation Wigwam. He stated further that during Opera-

tion Wigwam no personnel were exposed to the radiation levels discussed in Project 2.7 report "because the whole nature of the test would be to conduct it in such a way that there would not be this type of exposure."

He said, too, that the Project 0.17 report, of which he was the co-author, contained a summary of all of the interpretations made of the dosimetry films issued during the operation. Out of 7,103 operational badges that were issued, there were 350 exposures. (Exposure occurred when an individual was exposed to more than 100 millirems of radiation.) The highest exposure was 425 millirems, with the average exposure being 132 millirems. Out of the 748 daily badges that were issued there were 74 exposures, with the average exposure equaling 159 millirems and the maximum exposure being 350 millirems. He again restated that the report on the claimant's badge indicated he was not exposed to radiation. Baietti said that the acceptable limit for radiation exposure during Operation Wigwam was 3,900 millirems but that none of the personnel came close to this limit. He testified that everyone is exposed to a certain amount of radiation every day because it exists naturally in the environment. He stated that this is referred to as background radiation and measures about 100 to 175 millirems and that radiation-detection devices are calibrated to detect any radiation greater than 100 millirems. As a point of reference he noted that chest X rays can range from 10 to 200 millirems, with the normal range being 100-200 millirems. He stated that a person whose badge indicated he had been exposed to more than 100 millirems of radiation received the equivalent of a chest X ray. He testified, too, that the radiation given off by a nuclear bomb prior to its detonation would not be capable of penetrating a piece of paper and that since a bomb is normally encased in metal, personnel handling it would not be exposed to radiation.

On cross-examination, when asked a question con-

cerning whether each man who was issued a badge actually wore it, Baietti said, "whether he wore a badge is something I cannot attest to." Later he said: "The only record we have is of issuing the badges, to whom they were issued and who they were received from," and that exhibit No. 2, the document which recorded the deceased's radiation exposure, indicated to him that Greenberg was issued a badge and that it was returned, processed and evaluated. He said, too, that a person standing near the bomb site would receive a lethal dosage of radiation and that if the ships were deployed as ordered "there would be no way they would receive any radiation." He testified there had been no problem because of winds during Operation Wigwam.

The respondent introduced the ship's log for the *U.S.S. Curtiss* before the Commission. It showed that the bomb was detonated at 1301 hours on May 14, 1955, at which time the *Curtiss* was 11,540 yards away (over 6.5 miles) from the detonation site. It also showed that at 1801 hours on May 15, 1955, the ship departed for San Diego and arrived there on the morning of May 17, 1955.

The circuit court, in reversing and setting aside the second award, found that the Commission's decision was contrary to the manifest weight of the evidence. The court held, too, that the applicable statutes of limitation (see Ill. Rev. Stat. 1955, ch. 48, pars. 138.6 and 172.36) barred a claim under both the Workmen's Compensation Act and the Workmen's Occupational Diseases Act and that the claim under the Workmen's Occupational Diseases Act was barred because the statute has no extraterritorial applicability. Because we judge that the decision of the Commission in favor of the claimant was contrary to the manifest weight of the evidence, we need not consider the correctness of the other grounds given by the circuit court in reversing the Commission's decision.

The burden is upon the party seeking an award to

"prove by a preponderance of credible evidence the elements of his claim, particularly the prerequisite that the injury complained of arose out of and in the course of his employment." (*Hannibal, Inc. v. Industrial Com.* (1967), 38 Ill. 2d 473, 475.) It is axiomatic that it is for the Commission to determine facts and draw reasonable inferences from competent evidence in the record (*Oliver v. Industrial Com.* (1976), 65 Ill. 2d 228, 231), but when a finding of the Commission is contrary to the manifest weight of the evidence, the award cannot be allowed to stand (*Interstate United Corp. v. Industrial Com.* (1976), 65 Ill. 2d 434, 436).

We consider the claimant failed to prove the elements of her claim. There was not even sufficient proof that Carl Greenberg was exposed to radiation when participating in Operation Wigwam. The testimony of Dr. Harold Schwartz that he could have been exposed to radiation is not supported by the record and was contradicted by the positive testimony of Albert Baietti. The hypothetical question put to Dr. Schwartz as to whether the deceased could have been exposed to radiation was based on assumptions not supported by the record. For example, Dr. Schwartz was told to assume that the deceased was aboard a ship that was about five miles from the site of the blast, when the evidence established that the *U.S.S. Curtiss* was over 6.5 miles away. He was also told that no radiation monitoring took place during Operation Wigwam, when the evidence clearly showed that extensive monitoring was conducted. Significant, too, was Dr. Schwartz's admission that if Greenberg was upwind at the time of the blast it would make a substantial difference in whether he was exposed to radiation and Baietti's uncontradicted testimony that the *Curtiss* was deployed upwind "so as to be completely out of what was considered to be the radiological environment."

The record shows that the Project 0.17 report was the

report that dealt with the possible exposure to radiation of personnel, and that the Project 2.7 report, relied upon by Dr. Schwartz, was not concerned with this question. The Project 0.17 report described both the radiation-monitoring system used and the extensive safety precautions taken during Operation Wigwam. The report shows that the *U.S.S. Wright,* which was closer to the detonation site than the *Curtiss,* constantly monitored the air and water for possible radiation contamination and at no time recorded anything greater than normal background radiation. The film badge issued to Carl Greenberg was also evidence that he was not exposed to radiation during Operation Wigwam.

For the reasons given, the judgment of the circuit court is affirmed.

*Judgment affirmed.*