H & H PLUMBING COMPANY, Appellant, v. THE INDUSTRIAL COMMISSION *et al.* (Carl Wade, Appellee).

Fifth District (Industrial Commission Division)   No. 5—87—0416WC

Opinion filed June 1, 1988.—Rehearing denied July 8, 1988.

Edward M. Vokoun, of Evans & Dixon, of St. Louis, Missouri, for appellant.

James H. Cooksey, of Crain, Cooksey & Veltman, Ltd., of Centralia, for appellees.

JUSTICE CALVO delivered the opinion of the court:

Claimant, Carl Wade, filed a claim under the Workers' Occupational Diseases Act (the Act) (Ill. Rev. Stat. 1979, ch. 48, par. 172.1 *et seq.*) alleging that he contracted an occupational disease arising out of and during the course of his employment with H & H Plumbing Company (H & H). The arbitrator denied compensation, but the Industrial Commission (the Commission) reversed the arbitrator's decision and awarded claimant temporary total disability benefits for $123^{2}/_{7}$ weeks. The Commission also found claimant to be permanently disabled to the extent of 10% of a whole person. The circuit court confirmed the Commission's decision and H & H now appeals to this court. The sole issue before us is whether the Commission's decision that claimant was exposed to asbestos and contracted an occupational disease arising out of and during the course of his employment with H & H was against the manifest weight of the evidence.

The 66-year-old claimant, a pipe fitter since 1959, worked for H & H from the fall of 1975 through January 18, 1980. While employed with H & H, claimant worked on the construction of the World Color plant (the plant) in Salem, Illinois. Claimant worked a regular 40-hour week with some occasional overtime; his primary duty was welding. A. B. Burton, vice-president and purchasing agent for A & K Midwest Insulation Company (A & K), testified that A & K served as the subcontractor under H & H for the insulation at the plant. He testified that he personally purchased all of the materials necessary for the in-

sulation at the plant, and that he never purchased any materials labeled as or containing asbestos.

Claimant, however, alleges that he was exposed to asbestos from two sources at the plant. First, claimant alleges that gaskets—white, three-fourths of an inch, rope-like material used to insulate inspection plates on boilers—contained asbestos. Claimant testified that as part of his duties he helped install approximately four boilers in the plant. The boilers contained plates which could be removed so that a person could go inside the boilers to clean or inspect them. When the pipe fitters replaced the plates, they glued the gaskets around the plates to seal them airtight. In order to put the gaskets on, claimant testified that he first had to saw the gaskets with a hacksaw in order to make them the correct size. Sawing the gaskets produced white dust, which was inhaled by claimant and fell on claimant's clothes. H & H did not provide any breathing masks, and claimant did not use any such masks.

Darrel Hayes, a pipe fitter for 20 years, worked at the plant between 1976 and 1980. Hayes testified that he helped install and insulate the boilers. According to Hayes, five boilers were installed; each boiler took two to three weeks to install. Hayes testified that he worked specifically with claimant to saw the gaskets. He corroborated claimant's testimony regarding the appearance and use of the gaskets, and the dust the gaskets produced when they were sawed. Hayes referred to the gaskets as "asbestos string."

Clifford Martin, a plumber and field superintendent for the plant between 1975 and 1979, testified that the pipe fitters did not have to add the gaskets to the boilers, although he had never installed a boiler. He testified that World Color, not H & H, ordered the boilers and Train Murray manufactured them. According to Martin, the inspection plates were taken off in order to get inside the boilers and remove the shipping braces and other material packed inside them during shipment. The inspection plates were presealed when World Color received the boilers, but the seals were broken when the doors were taken off to remove the packing material. The pipe fitters removed the doors and then reinstalled the seals after the doors were put back on.

Lee Severs, general foreman at the plant between 1978 and 1980 and a former pipe fitter, testified that not only were the inspection plates taken off to remove the packing material, but the plates were taken off again after the boiler was fired so that an inspector could go inside the boiler. The pipe fitters then resealed the plates after the inspection. Severs also testified that the gaskets were made of asbes-

tos fibers. Robert Norris, general foreman at the plant from 1974 through 1978 and a pipe fitter, also testified that "rope asbestos gaskets" were used to seal the boiler doors. He testified that the gasket material was prepackaged and shipped with the boilers. Norris testified further that at least two and maybe as many as four openings on the boiler had to be sealed with gaskets. He did not, however, observe the pipe fitters saw the gaskets.

Richard Acklin, part owner and officer of H & H and project manager at the plant between 1975 and 1980, testified that the gaskets were on the boilers when H & H received the boilers. Moreover, he did not see any of the pipe fitters saw or install the gaskets on the boilers, and he observed that the pipe fitters' work area was relatively free of dust. Burton testified that to his knowledge some gasket material is made of asbestos. He stated that A & K neither supplied the gaskets at the plant nor installed them. Furthermore, James Alexander, president of A & K, testified that A & K did not use gaskets, but in the past an asbestos rope was used in seals around boilers. He had not seen such material, however, for 30 years. Although Alexander stated that gaskets were not required or used as boiler seals at the plant, he also stated that the manufacturer insulated the boilers, not A & K. Alexander testified that even fiberglass insulation creates some dust when it is cut.

Claimant also alleges that he was exposed to asbestos through the welding blankets used at the plant. Claimant testified that the pipe fitters used "asbestos" or "welding" blankets to cover and protect equipment from sparks and hot slag produced by the welding. Claimant stated that the pipe fitters periodically cleaned and moved the blankets during the course of the day. To clean a blanket, two people shook it to get the dust and pieces of slag off of it. As the blanket was shaken, a cloud of light brown dust flew in the air. According to claimant, the pipe fitters never used canvas tarpaulins to protect the equipment. Claimant admitted that he did not see any labels on the blankets indicating that they contained asbestos.

Claimant testified that between 40% and 50% of the time he functioned as a nonworking foreman; the remainder of the time he functioned as a working foreman. As a nonworking foreman, under union rules, claimant could not handle the materials or tools—he functioned strictly as a supervisor. Claimant acknowledged that, as a union member, he abided by these rules. Consequently, when he was a nonworking foreman, he did not move or shake the blankets. Norris testified, however, that nonworking foremen sometimes helped their crew even though the union rules would not allow it. Hayes testified

that claimant occasionally helped with the blankets even when claimant was a nonworking foreman. Claimant also testified that he worked outdoors in the open air part of the time.

Hayes, Severs, Norris, and Thomas Wade, a pipe fitter and claimant's son, corroborated claimant's testimony. Hayes stated that he and claimant used a white blanket about six feet by eight feet by one-fourth of an inch in size. Hayes stated that when he and claimant shook the blanket white dust came out of it, and the dust fell on their clothes and hands. Norris also said the blankets were always dusty. Hayes and Norris, however, admitted that the blankets did not have labels on them identifying their contents. Wade, who worked for H & H periodically from 1976 through 1980 at the plant, and Severs stated that they saw claimant use a welding blanket at the plant. Wade stated that after shaking the blankets, the pipe fitters got so much dust and white fuzz on their clothes that they used an air hose to blow themselves off.

Severs and Norris testified that the pipe fitters used a total of three welding blankets at the plant between 1975 and 1980. Severs stated that during his 40 years as a pipe fitter he referred to the blankets as "welding asbestos blankets." Norris testified that he called the blankets "fire" or "asbestos" blankets. Hayes stated that claimant obtained the blanket he and claimant used from the general foreman. Severs testified that H & H purchased the blankets before he became general foreman and that an H & H truck delivered the blankets sometime in 1978. According to Norris, the blankets came from the H & H warehouse. Severs testified that he personally owns a welding blanket which he keeps in his workshop at home and which he uses to protect his equipment during his personal welding jobs. He testified further that the appearance of his blanket was similar to the appearance of the blankets used at the plant. Severs admitted that the pipe fitters did not use his blanket at the plant. One tarp, about 30 feet by 110 feet, was also used at the plant, according to Severs. The tarp, however, was hung vertically and used as a fire wall. Severs and Hayes stated that they did not use tarps to cover equipment because the sparks would burn through the tarp. According to Severs, when the tarp is hung vertically as a fire wall, however, the sparks merely hit the tarp and fall to the floor.

Acklin testified that he did not see blankets on the jobsite and he had no personal knowledge of anything used to cover equipment during welding. He also stated that he did not know if H & H possessed any welding blankets. Acklin described a welding blanket as a green or brown canvas-like tarpaulin. Acklin admitted that he did not nor-

mally deal with welding materials; those materials were dealt with on a day-to-day basis and handled directly between the general foremen (Norris and Severs) and the supplier. Acklin testified that H & H used only one welding supplier—American Welding in Mount Vernon, Illinois—and it sold welding blankets. Acklin also stated that he did not keep abreast of the pipe fitters' daily duties.

Martin testified that although he was at the plant almost every day and saw the pipe fitters' work areas on a daily basis, he did not see any welding blankets, and he thought the air around the pipe fitters was clean. Martin testified that he had no personal knowledge of any welding blankets purchased or ordered by H & H. Martin testified that he periodically saw the pipe fitters handle brown or dark green canvas-like tarps, about 12 feet by 16 feet, which they used to cover the equipment. Martin also acknowledged that tarps would get holes burned in them if slag or sparks landed on them.

Although Burton testified that he did not see any of the A & K men using asbestos products, he acknowledged that he only went to the plant three times. He also stated, however, that he was familiar with asbestos cloth and knew that it was used as a blanket to cover and protect items from welding slag. Alexander admitted that blankets made of asbestos cloth are still manufactured, although he had not seen them used outside of powerhouse construction. He also said that A & K did not provide the pipe fitters with any material to protect the equipment.

Finally, William Lowry, a chemist employed by Industrial Testing Laboratories for 15 years, testified that he tested a sample from Severs' personal welding blanket and found that it contained 70% to 80% chrysotile asbestos and 20% to 30% cotton. Lowry admitted that asbestos fibers can be encapsulated into the material so that they are not aerial, but in his opinion, the fibers in Severs' blanket were inhalable because that blanket did not contain any encapsulating material. Lowry testified further that the proximity of the worker to the blanket and the ventilation in the work area also determined whether a particular person could have inhaled the asbestos fibers.

H & H argues that claimant did not offer any competent evidence that the gaskets and blankets used at the plant actually contained asbestos. No one testified that the gaskets and blankets contained labels identifying their contents as asbestos. Moreover, according to H & H, all of the testimony, except Lowry's, consisted of lay opinion and speculation as to the contents of the gaskets and blankets. In addition, Lowry's opinion pertained to a blanket that claimant admitted was not used at the plant. H & H also notes that none of the medical records

show that claimant told his doctors of his alleged exposure to asbestos at the plant. H & H points out and the record reveals that claimant has filed a complaint against approximately 30 manufacturers of construction materials alleging that he was exposed to asbestos from those materials during the course of his work as a pipe fitter. The complaint, however, excludes H & H and any work performed at the plant. H & H also contends that allowing some of the witnesses to testify that they called the blankets "asbestos blankets" and the gaskets "asbestos string" over the objection of H & H's counsel prejudiced H & H's case.

■■■ Despite H & H's contentions, sufficient evidence existed to support the Commission's decision. The witnesses could properly testify to their personal observations, including the appearance of the gaskets and blankets and the amount of dust which resulted from cutting the gaskets and shaking the blankets. (*Baggett v. Ashland Oil & Refining Co.* (1968), 92 Ill. App. 2d 433, 447, 236 N.E.2d 243, 249.) Likewise, the witnesses could properly testify to what they called the gaskets and blankets. They could not, however, testify to what they heard others call the gaskets and blankets because such testimony is hearsay. *Murphy v. Urso* (1980), 83 Ill. App. 3d 779, 785, 404 N.E.2d 287, 293, *affirmed in part and reversed in part* (1981), 88 Ill. 2d 444, 430 N.E.2d 1079.

■■ Nevertheless, even if the witnesses' testimony regarding what they called the gaskets and blankets was inadmissible, admitting that testimony was not prejudicial to H & H, because other evidence supported a finding that the materials contained asbestos. The Commission relied on claimant's testimony regarding his work on the boilers and the appearance of the gaskets. The Commission also relied on the testimony of Norris, H & H's general foreman, that the gaskets contained asbestos. Moreover, the Commission chose to believe the testimony that the pipe fitters used blankets rather than tarps at the plant, and that claimant handled and shook the blankets. The Commission also relied on the testimony of Severs, H & H's other general foreman, who said that claimant used a welding blanket, which he had always known as a "welding asbestos blanket," supplied by H & H, and that he personally owned one similar in appearance to the blankets used at the plant. In addition, the Commission relied on Lowry's tests, which revealed that Severs' blanket contained 70% to 80% asbestos. The Commission's job is to weigh the credibility of witnesses (*Smith v. Industrial Comm'n* (1983), 98 Ill. 2d 20, 23, 455 N.E.2d 86, 88) and resolve conflicts in evidence (*Spector Freight System, Inc. v. Industrial Comm'n* (1983), 93 Ill. 2d 507, 514, 445 N.E.2d 280, 283).

Thus, it could rely on claimant's testimony, and the testimony corroborating claimant's version of the facts, over any conflicting testimony. H & H points to *Fletcher v. Industrial Comm'n* (1970), 44 Ill. 2d 359, 255 N.E.2d 403, and *Illinois Institute of Technology v. Industrial Comm'n* (1977), 68 Ill. 2d 236, 369 N.E.2d 853, for support. Although these cases dealt with the issue of whether claimant was exposed to the hazard of an occupational disease during the course of employment, we believe the facts, testimony, and evidence in those cases distinguish them from the case at bar. Thus, they do not control our decision here.

■ Moreover, circumstantial evidence may be used to establish a case as long as the circumstances are so related to one another that the proposed conclusion is the only one that can be reasonably drawn; but, the proof must be based on something more than mere conjecture. (*Werner's Furniture, Inc. v. Commercial Union Insurance Co.* (1976), 39 Ill. App. 3d 59, 65-66, 349 N.E.2d 616, 621; see *Pearson v. Ford Motor Co.* (1975), 32 Ill. App. 3d 188, 191, 336 N.E. 2d 528, 530.) In the case at bar, the Commission could reasonably infer from the evidence that the gaskets and welding blankets contained asbestos. All of the witnesses were either career pipe fitters or familiar with insulation and thus were well acquainted with the properties of gaskets and welding blankets. Claimant testified that sawing the gaskets produced a white dust which he inhaled. Moreover, the gaskets were used to insulate the boilers and the record revealed that asbestos is a fireproof material. Severs and Norris, H & H's general foremen, both testified that the gaskets contained asbestos. Burton, vice-president of the company that provided the insulation at the plant (although not the supplier of the gaskets), testified that some gasket material contained asbestos. Claimant also presented evidence that the asbestos in the blankets was what made them fireproof and thus was what made them useful for protecting equipment from sparks and hot slag produced by the welding. Severs testified that not only was his blanket similar in appearance to those used at the plant, but he used it for exactly the same purposes as the blankets used at the plant. Lowry testified that Severs' blanket actually contained inhalable asbestos fibers. In addition, claimant and the other pipe fitters testified consistently that they frequently shook the blankets and that dust flew out of the blankets; thus, it could be inferred that they inhaled the asbestos fibers.

*Zupan v. Industrial Comm'n* (1986), 142 Ill. App. 3d 127, 491 N.E.2d 753, presented a similar situation. In *Zupan*, claimant, a bricklayer, testified that he believed bricks he handled contained as-

bestos. (*Zupan*, 142 Ill. App. 3d at 129, 491 N.E.2d at 753.) Claimant did not introduce any expert testimony as to the contents of the bricks. On the other hand, one of the salesmen who supplied bricks to the employer identified one insulating brick and testified that it did not contain asbestos. (*Zupan*, 142 Ill. App. 3d at 130, 491 N.E.2d at 755.) Claimant testified that the brick identified by the salesman was not the only type of brick used by the employer. Both the arbitrator and the Commission found that claimant was exposed to asbestos at work, but denied compensation for other reasons. (*Zupan*, 142 Ill. App. 3d at 130-31, 491 N.E.2d at 755.) On review, the court stated that claimant clearly had been exposed to asbestos. The court did not require that claimant introduce physical evidence of the product alleged to have contained asbestos, it allowed the Commission to rely on claimant's testimony as to his asbestos exposure, and it did not require expert testimony as to the contents of the bricks. Claimant did testify, however, that he believed the bricks were labeled as containing asbestos. (*Zupan*, 142 Ill. App. 3d at 128, 491 N.E.2d at 754.) In addition, the employer could not deny that it may have used asbestos bricks for several of the years claimant was employed.

■ Although none of the witnesses in the case at bar testified that they saw labels on the blankets, and although H & H denied that it used asbestos products, claimant presented evidence not found in *Zupan*—namely, scientific evidence that a product, a welding blanket, similar to that used during the course of his employment, contained asbestos. Consequently, based on the testimony as to claimant's exposure to asbestos from the gaskets and blankets, and based on the connection between Severs' blanket and the blankets used at the plant, the Commission's finding that claimant was exposed to asbestos during the course of his employment was not against the manifest weight of the evidence.

H & H also contends that the medical evidence was insufficient to sustain the Commission's finding that claimant contracted an occupational disease due to his exposure to asbestos during the course of his employment. Dr. Israel Jerome Flance, a specialist in internal medicine and lung diseases, testified that he examined claimant in January of 1980 because claimant had a fever, a cough, irregular breathing, chest pains, and because claimant was spitting up sputum and could not keep his balance. Flance admitted claimant into the hospital and subsequent tests confirmed that claimant had interstitial lung disease and pleurisy, a disease or thickening of the pleura (the lining of the lung). Flance admitted claimant into the hospital again in April of 1980, because claimant suffered from a low fever and continued to

complain of chest pain. Flance performed a thoractomy in order to biopsy a section of claimant's left lung. The biopsy of the lung and pleura showed scarring of the pleura and thickening of the pleura and lungs. Flance found one asbestos body in the biopsied section. Flance diagnosed asbestosis of the lungs and pleura caused by inhalation of asbestos fibers over a long period of time. According to Flance, the asbestosis also led to claimant's chest pains and mild decrease in lung function. Flance testified that although any asbestos exposure claimant experienced from 1975 to 1980 was not the sole cause of the disease, such exposure certainly aggravated the asbestosis. Flance also stated that as of May 1980, claimant was permanently disabled to work as a pipe fitter. Flance admitted, however, that claimant could perform light or sedentary types of jobs.

In May of 1982, claimant underwent a quadruple heart bypass. Claimant admitted that he has smoked approximately one pack of cigarettes per day since he reached the age of 15. Claimant testified that he continues to have chest pains, he cannot exert himself, he must walk slowly, and he has trouble climbing stairs. Flance testified that claimant's heart surgery had no relation to his asbestosis, and likewise, claimant's lung condition did not cause the heart problem. The heart problem, however, contributed to claimant's disability. Flance admitted that coughing and shortness of breath are symptoms of cigarette smoking, but that cigarette smoking causes chronic obstructive lung disease and claimant suffers from restrictive lung disease. Flance also testified that in May of 1980 he found a mild obstructive component related to claimant's smoking in addition to the restrictive pattern.

Flance acknowledged that the pathologists in the hospital disagreed as to whether an asbestos body was found in the biopsy. The initial pathology report, signed by Dr. Walter Bauer, a pathologist, revealed that asbestos fibers were not present in the lung tissue. Bauer did not diagnose asbestosis, but Flance, who personally reviewed the microscopic slides, disagreed with Bauer's diagnosis. An addendum, however, was later attached to the original pathology report. The addendum stated that a single asbestos body was found in the biopsied tissue. Flance testified that the addendum arose because he asked Dr. Louise Katzenstein, a lung pathologist, to review the slides and she found an asbestos body. She agreed that an addendum would be attached to the report. Bauer signed the addendum.

Flance testified that asbestos bodies can be found in the lungs as a result of normal environmental exposure. Flance testified that by counting the number of asbestos bodies in a certain area of the lung

tissue one can determine whether a particular person has been exposed to asbestos at work or through the normal environment. The more bodies in the tissue, the more likely exposure to asbestos in the workplace caused the asbestosis. Flance pointed out, however, that subjecting the tissue to an electron microscopic scan permits a more accurate determination; otherwise, some asbestos bodies escape undetected. Flance testified that claimant's tissue was not subjected to such a scan. Flance also testified that a lot of asbestos is dissolved in the lungs so that it leaves no trace of itself as a fiber. Flance acknowledged that chrysotile, the most common form of asbestos in the United States, can be lodged in the lungs and leave no trace. Flance testified, however, that the feature that most clearly differentiates asbestosis from other forms of lung fibrosis is the presence of asbestos bodies in the lungs.

Dr. Robert Senior, a specialist in pulmonary diseases, testified for H & H. Senior reviewed claimant's hospital records and examined claimant twice—in February 1981 and in April 1982. Senior testified that claimant did not have asbestosis. Senior testified that he did not observe any asbestos fibers in the lung tissue. Nevertheless, assuming the biopsy revealed a single asbestos fiber, Senior testified that that would not have affected his diagnosis because the number of fibers found was small and thus could be obtained from normal environmental exposure.

Senior, in his report of May 7, 1982, diagnosed claimant as having pleural disease caused by asbestos. In asbestos pleurisy, the asbestos particles get into the lungs and irritate the outer and inner surface of the chest wall and stimulate inflammation which leads to fluid production. Senior's report stated that asbestos-related pleural disease was a stronger possibility because a year had passed since his first examination of claimant and no other diagnosis had been made. In addition, Senior testified that asbestos pleurisy results from rather minimal and brief exposure to asbestos. Senior testified that if claimant was exposed to asbestos at H & H , it could have caused, contributed to or aggravated the asbestos pleurisy, if the particles were inhalable. Asbestosis, according to Senior, results from long-term exposure to asbestos. Finally, Senior did not exclude the possibility that claimant had a restrictive lung disease. Senior stated that in his first examination of claimant the disease was not restrictive. After Senior's second examination, however, claimant had a mild restrictive lung disease. Senior noted that claimant had an obstructive lung disease as well which was caused by smoking.

▉▉ An "occupational disease" is defined as

"a disease arising out of and in the course of the employment or which has become aggravated and rendered disabling as a result of the exposure of the employment. Such aggravation shall arise out of a risk peculiar to or increased by the employment and not common to the general public." (Ill. Rev. Stat. 1979, ch. 48, par. 172.36(d).)

The medical evidence revealed that claimant's exposure to asbestos created a risk of contracting an asbestos-related disease which was greater than the risk to the general public, and claimant was exposed to that risk in a manner different from the general public. (See *Zupan*, 142 Ill. App. 3d at 132, 491 N.E.2d at 756.) Both doctors testified that claimant suffered from a lung disease caused by asbestos. Flance diagnosed asbestosis, which he stated could have been aggravated by claimant's exposure to asbestos during the five years he worked for H & H. Although Senior diagnosed asbestos-related pleurisy rather than asbestosis, he testified that asbestos pleurisy can be caused by short-term exposure to inhalable asbestos particles, and if claimant was exposed during his employment with H & H, such exposure could have caused or aggravated claimant's asbestos pleurisy. Consequently, the Commission's decision that claimant contracted an occupational disease arising out of and during the course of his employment was not against the manifest weight of the evidence.

■■ H & H additionally argues that even if claimant was exposed to asbestos at the plant, no liability can attach to H & H because claimant's work at the plant did not actually contribute to claimant's disease. H & H's position is that claimant's exposure to asbestos prior to his employment with H & H caused claimant's disease. Illinois law provides:

"The employer liable for the compensation in this Act provided shall be the employer in whose employment the employee was last exposed to the hazard of the occupational disease claimed upon regardless of the length of time of such last exposure, except, in cases of silicosis or asbestosis, the only employer liable shall be the last employer in whose employment the employee was last exposed during a period of 60 days or more after the effective date of this Act, to the hazard of such occupational disease ***." (Ill. Rev. Stat. 1979, ch. 48, par. 172.36(d).)

We have already found that claimant was exposed to the risk of an occupational disease at the plant. Moreover, medical evidence established that claimant's exposure to asbestos aggravated, caused, or contributed to the disease. Finally, H & H did not present any evi-

dence that claimant was exposed to the hazard of the disease *after* claimant's employment with H & H. Thus, H & H's argument is without merit. We also note that H & H's reliance on *Thermos Co. v. Industrial Comm'n* (1980), 83 Ill. 2d 54, 413 N.E.2d 1246, is misplaced. In *Thermos*, claimant developed a respiratory disease as a result of her exposure to noxious fumes during employment. The court held that she was last exposed to the fumes in January 1971 even though she was reexposed to the fumes in October 1972. The employer changed insurance carriers between 1971 and 1972, and the earlier carrier tried to argue that claimant was last exposed in 1972 so compensation should commence on that date. Thus, the problem in *Thermos* was not determining which employer was liable under the Act. Rather, the court had to determine when claimant was last exposed to the hazards of the disease in order to establish when compensation should commence and thus which of the employer's two insurance carriers was liable. The court found that claimant became incapacitated prior to 1972. It, therefore, held that the correct date was not 1972, when claimant was technically last exposed to the fumes, but 1971 because that was the date claimant was last exposed to the fumes prior to her incapacity. Consequently, *Thermos* is distinguishable from the case at bar.

Lay and expert testimony established that claimant was exposed to asbestos from gaskets and welding blankets used at the plant. The medical evidence from both doctors revealed that claimant suffered from an asbestos-related disease, and that if claimant was exposed to asbestos at work between 1975 and 1980, such exposure could have aggravated or caused his disease. We hold, therefore, that the Commission's decision was not against the manifest weight of the evidence.

Accordingly, the decision of the circuit court of Marion County is affirmed.

Affirmed.

BARRY, P.J., and McCULLOUGH, McNAMARA and WOODWARD, JJ., concur.