UNIVERSITY OF ILLINOIS, Appellee, v. THE INDUSTRIAL COMMIS-
SION *et al.* (Robert Powers, Appellant).

First District (Industrial Commission Division)   No. 1—91—1567WC

Opinion filed July 10, 1992.

Thomas G. King, of Chicago, for appellant.

Seyfarth, Shaw, Fairweather & Geraldson, of Chicago (Julie A. Garrison, of counsel), for appellee.

PRESIDING JUSTICE McCULLOUGH delivered the opinion of the court:

This is an appeal by the claimant, Robert W. Powers, from the judgment of the circuit court of Cook County confirming on judicial review the decision of the Industrial Commission of Illinois (Commission) with regard to claims for temporary total disability benefits (TTD) pursuant to sections 19(b—1) and 8(b) of the Workers' Compensation Act (Act) (Ill. Rev. Stat. 1985, ch. 48, pars. 138.19(b—1), 138.8(b)) and reimbursement of necessary and reasonable medical bills pursuant to section 8(a) of the Act (Ill. Rev. Stat. 1985, ch. 48, par. 138.8(a)). The respondent employer in this case is the University of Illinois. The issues presented for review are as follows: (1) whether the Commission's determination that the report of Drs. Herbert White and Stephan Hessl was inadmissible was an abuse of discretion; (2) whether the finding of the Commission, affirming the arbitrator's finding that claimant was not temporarily and totally disabled subsequent to February 12, 1986, is against the manifest weight of the evidence; (3) whether the finding of the Commission, affirming the arbitrator's finding that medical expenses in the amount of $2,861 were not reasonable and necessary was against the manifest weight of the

evidence; (4) whether the Commission erred in refusing to allow oral argument after the second remand by the circuit court; and (5) whether the circuit court erred in remanding the cause to the arbitrator for the limited purpose of introducing additional evidence.

On March 11, 1986, claimant filed an application for adjudication of claim alleging accidental injuries arising out of and in the course of his employment on February 3, 1986. On October 3, 1986, he filed the section 19(b—1) petition. Following a hearing conducted on November 3 and 10, 1986, the arbitrator found the claimant was entitled to receive from respondent $494.67 per week for 36⁶/₇ weeks for TTD and the claimant was entitled to receive from respondent $2,861 for necessary first aid, medical, surgical, and hospital services. The decision was affirmed by the Commission on March 25, 1987.

On judicial review taken by respondent (Cook County case No. 87—L—50412), the circuit court remanded the cause to the Commission for the limited purpose of allowing respondent the opportunity to present rebuttal evidence with regard to claimant's work duties. On October 27, 1987, the arbitrator conducted an additional hearing. At that hearing, the arbitrator heard only the testimony of Frank W. Krejnik, the general foreman. Krejnik testified concerning the work claimant was performing at the time he attempted to return to work in May 1986. On October 29, 1987, the arbitrator issued a memorandum of decision modifying the earlier decision and finding claimant was temporarily totally disabled for five-sevenths of a week.

On November 25, 1987, claimant filed a petition for review of the arbitrator's decision with the Commission. On May 10, 1988, the cause was submitted on the record and proofs were closed. On June 7, 1988, claimant filed a request that the Commission reopen proofs to allow for the consideration of the February 13, 1987, medical report of White and Hessl. On November 28, 1988, the Commission denied the request to reopen proofs. On March 28, 1989, the Commission vacated the October 29, 1987, decision of the arbitrator because the arbitrator acted without the authority of the Commission or the circuit court to readjudicate the matter. Claimant's petition for review was dismissed and the complete record was certified to the circuit court.

On May 19, 1989, the circuit court set aside the Commission's March 28, 1989, decision and remanded the cause for consideration of Krejnik's testimony. On remand, the Commission's decision of February 9, 1990, affirmed the October 29, 1987, decision of the arbitrator. The opinion of the Commission also noted that claimant filed a motion to reconsider the denial of reopening proofs on July 7, 1989, which motion was denied on July 11, 1989, following a hearing. Claimant's

petition for judicial review by the circuit court was docketed as Cook County case No. 90—L—50265. On August 9, 1990, case No. 90—L—50265 was consolidated with case No. 87—L—50412.

For purposes of our decision, the first issue is whether the circuit court was correct in its first remand order, in allowing respondent to present rebuttal evidence with regard to claimant's work duties. If there was no error at the first arbitration hearing, the next issue is whether the first decision of the Commission, that of March 25, 1987, is against the manifest weight of the evidence. If not, it must be confirmed.

Section 19(f)(2) of the Act provided in part:

"The court may confirm or set aside the decision of the Commission. If the decision is set aside and the facts found in the proceedings before the Commission are sufficient, the court may enter such decision as is justified by law, or may remand the cause to the Commission for further proceedings and may state the questions requiring further hearing, and give such other instructions as may be proper." (Ill. Rev. Stat. 1985, ch. 48, par. 138.19(f)(2).)

Pursuant to section 19(f)(2), the trial court did have the authority to remand for "questions requiring further hearing." Here, in remanding, it was necessary to find the arbitrator abused his discretion in denying the respondent a continuance.

■■ The arbitrator may grant a continuance under section 19(b—1) if material is discovered at the hearing which has not been previously disclosed. Implicit in the circuit court remand for additional evidence is the finding that the arbitrator erred by failing to grant the continuance. We hold the remand by the circuit court to allow the respondent to place the testimony of Krejnik into evidence before the arbitrator was improper.

Claimant testified on direct examination before the arbitrator on November 3, 1986. The cause was continued to November 10, 1986, at which hearing claimant's testimony continued, including cross-examination. Section 19(b—1) of the Act requires the respondent to file a written response to include "the name and address *** of each witness *** upon whom the [respondent] will rely to support his allegations." (Ill. Rev. Stat. 1985, ch. 48, par. 138.19(b—1).) Respondent failed to designate any witnesses in its response to claimant's section 19(b—1) petition.

The respondent should also have been aware that the evidence could not be presented before the Commission on review. (See 50 Ill. Adm. Code §7020.80(b)(4)(C) (Supp. 1986) (as amended Oct. 15, 1985).)

Indeed, the respondent, in its statement of exception/addition to the Commission, recognized that the Commission does not generally consider such evidence. Respondent now argues that the evidence was necessitated by the disclaiming of time records by claimant on cross-examination. According to respondent, this was a surprise. However, the request for continuance made to the arbitrator was as follows:

"[Respondent's Attorney]: Your Honor, Respondent would also either like a continuance to present testimony as to what the petitioner's job duties were at the University of Illinois or because of the nature and the fact that this is a 19(b—1), we would ask for leave from the Industrial Commission to present that evidence on review should it be necessary.

THE ARBITRATOR: It may be presented on review; but as far as this case is concerned, it's closed. Your proposed findings are due one week from today."

The request does not disclose any surprise on the part of respondent and, in any event, the failure to anticipate the testimony and witnesses necessary to present one's case is not the same type of "surprise" as being confronted with newly discovered evidence. The respondent had one week between arbitration hearings to prepare a response to a claimant who had been testifying contrary to what respondent understood the facts to be. Nothing was done.

In its statement of exceptions to the Commission, respondent makes the conclusion that in other areas claimant has "shown a propensity for testifying contrary to what the actual records show." This is the sole reason put forth by the respondent to present additional evidence. Respondent does not assert the arbitrator erred in his ruling, nor does the record reveal what the new evidence would show. This is not a showing of "good cause" as set forth in section 7020.80(b)(3)(A)(iii) of title 50 of the Illinois Administrative Code. 50 Ill. Adm. Code §7020.80(b)(3)(A)(iii) (Supp. 1986) (as amended Oct. 15, 1985).

In summary, the arbitrator did not err in refusing the continuance for the following reasons:

(1) Section 19(b—1) requires the respondent, within 15 days after receipt of notice that a petition was filed, to file a written response to each claim, copies of reports, records, documents and affidavits in its possession or demanded by subpoena and the name and address of witnesses on whom the respondent will rely in support of its response.

(2) The testimony of the claimant was given on November 3, 1986. The cause was continued to November 10, 1986. Re-

spondent did nothing in the intervening week which would indicate material information was discovered which was not previously disclosed.

(3) Respondent requested alternative relief before the arbitrator, either a continuance, or an opportunity to present evidence to the Commission. The arbitrator, albeit it was not a viable alternative, granted respondent its request to present evidence to the Commission.

(4) Section 7020.80(b)(4)(C) of title 50 of the Illinois Administrative Code states: "No hearing on Review will be held by the Commission." 50 Ill. Adm. Code §7020.80(b)(4)(C) (Supp. 1986) (as amended Oct. 15, 1985).

(5) Respondent did not suggest to the arbitrator (or the Commission) what the new evidence would show. No showing of good cause was made.

Having determined that the arbitrator did not err in refusing to grant a continuance, this court need not decide whether the refusal on remand to consider the report of White and Hessl was error or whether the failure to allow oral argument following the second remand was error.

Claimant in his brief asks this court to find the first decision of the Commission was not against the manifest weight. Respondent argues the third decision of the Commission, February 9, 1990, was not against the manifest weight of the evidence.

We do not by this decision compare the Commission's award of February 9, 1990, *i.e.*, five-sevenths of a week TTD, to its March 25, 1987, decision awarding 36⁶/₇ weeks TTD. It is not within our province to second-guess the Commission. We first review the Commission's decision of March 25, 1987, affirming the arbitrator's TTD award of $494.67 per week for 36⁶/₇ weeks, plus $2,861 for necessary first aid, medical, surgical, and hospital services. We find the March 25, 1987, decision of the Commission was not against the manifest weight of the evidence.

The decisions of the arbitrator and Commission awarded as TTD lost time from work from February 3, 1986, through May 1, 1986, and from May 23, 1986, to date of hearing, November 10, 1986. Claimant testified he was injured on the job on February 3, 1986, while pushing a push truck he and another worker had loaded with large torpedo fuses. He was employed at the university as an electrician. He estimated each fuse weighed 80 to 100 pounds and they had loaded 10 or 15 on the truck. He estimated the load was in excess of 1,000 pounds. As he started pushing the truck, he felt a sharp stab-

bing pain in his back and a numbness in his right leg. He immediately told his partner, who finished pushing the truck. Claimant did not unload the truck and went back to the shop and sat down. He also informed his foreman. The next day he saw Dr. Clark Montgomery, a university doctor.

Montgomery's reports indicated that on February 7, 1986, X rays and a computerized tomography (CT) scan of the lumbar spine were taken, which revealed:

> "Multiple axial scams of the lumbosacral spine were obtained from L3 to S1.
>
> FINDINGS: Bilateral spondylolysis of L5 is noted. There is 5 mm anterior subluxation of L5 on S1 as seen in the sagittal reformatted views. Noted is a small herniation at the disc level between L4-L5 best seen in the soft tissue technique in box #41."

Montgomery saw claimant on several follow-up visits. On February 7, 1986, Montgomery did not direct claimant back to work, but recommended bed rest after finding diminished left sciatica and low back pain. On February 11, 1986, claimant was treated with pain pills and released to return to work on February 12. He was also referred to Dr. John W. Shimkus. On February 18, 1986, the treatment was continued. On February 25, 1986, Montgomery's report noted claimant was being seen by Dr. James Lambur for physical therapy. On the report, Montgomery noted claimant was not working and had not taken his return-to-work slip to his supervisor as directed even though he had been released to return to work on February 12, 1986. On March 11, 1986, Montgomery noted claimant "complained of agonizing pain while smiling" and he refused to be examined by Montgomery and would not make another appointment. Shimkus, an orthopedic surgeon, reported finding no substantial evidence of musculoskeletal injury and recommended the patient be discharged. He further stated the 57-year-old claimant had additional medical conditions which might be responsible for his back pain other than a work-related cause.

According to Lambur's records, he first saw claimant on February 18, 1986, and examined him for low-back pain. Claimant complained of numbness and weakness in his legs, and pain across to the left side of his lower back, which he stated had gotten worse since the accident. He could not wiggle his toes on the right side.

At his appointment with Lambur on February 25, 1986, claimant continued to complain of radicular pain to the right lower extremity, although there was some improvement. The doctor advised that he re-

main off work, and continued a treatment plan of therapy and anti-inflammatory medication. A radiologist's report indicated a narrowing of the L4-L5 disc space and suspicion of disc herniation and of a degenerative spurring in the lower left spine, but no fracture.

On March 18, 1986, claimant still complained to Lambur of numbness. Claimant said his condition was "75% Better." An evaluation revealed straight leg raising to be positive on the right with reflexes being 2+ and equal. Sensory evaluation revealed diminished sensation to the right lower extremity. The possibility of lumbar fusion and discectomy at the L4-L5 level if therapy failed to ameliorate his symptoms was again discussed with claimant.

The evaluation of April 8, 1986, showed claimant about 80% improved. Lambur stated that claimant was able to return to work to perform light-duty work as of May 1, 1986. All of these findings were summarized in Lambur's report of May 5, 1986. The report also noted anti-inflammatory medication was prescribed.

On May 13, 1986, claimant told Lambur that his back bothered him. He told the doctor that since he returned to work on May 1, 1986, he had been doing heavy duty and was unable to cut cable because of back pain. According to claimant's testimony, Lambur returned him to therapy, traction, and rest. On May 19, 1986, Lambur issued a report certifying that claimant was currently under his care for chronic and recurring low-back discomfort. His diagnosis was one of bilateral spondylolysis of L5 with a grade I spondylolisthesis. The report stated:

> "It is not in Mr. Powers' best interest to be chronically flexed and bending over cutting cable. It would be better that he engage in an occupation that requires him to be more ambulatory and walking upright, rather than any chronic position for an inordinate period of time."

Claimant saw Lambur on June 24, 1986, who reported: "Not working since 6/2/86 or 6/3/86." Claimant advised Lambur he was feeling better and that therapy had helped. There were complaints of dizzy spells. The final time claimant saw Lambur was September 16, 1986. The doctor's notes for that date stated:

> "States that he has some good days and some bad. States that increased activity increases his discomfort in the low back area. Pt. states that he has occasional 'weak Spells' which I think are more dizzy spells. He is encouraged to obtain evaluation from his family doctor. The swimming program as advised by [therapist] is encouraged to increase his flexibility and to minimize his 'bad days' at work.

Robert Powers explained that I was unable to justify his being off work since February. Patient became hostile and stated that he was unable to work in his opinion. I reviewed the chart for him indicating that in my opinion he was not totally disabled. Patient became very disenchanted and abruptly left the examining room without further adieu."

At the request of Lambur, claimant was treated at the Chicagoland Orthopedic Rehabilitation Service (CORS) 44 times from February 20, 1986, through September 11, 1986, although therapy discontinued from April 29, 1986, to June 17, 1986.

Claimant was examined by Dr. Irwin T. Barnett, at the request of claimant's attorney, on July 10, 1986. Barnett's diagnosis was (1) residuals of a low-back injury with bilateral nerve root irritation; (2) flattening of the fourth lumbar disc space; and (3) defection in the interarticular region of the fifth lumbar vertebra (pars interarticularis). The Ely sign being positive bilaterally indicated lumbosacral disease. The straight leg raising test being positive to 50 degrees on the right and 60 degrees on the left (compared to 90 degrees being normal) indicated nerve root irritation in both lower extremities. The LaSegue sign was positive bilaterally and the Achilles and patellar reflexes were hyperactive bilaterally, both indicating nerve root irritation. The atrophy of the left thigh was due to favoring of the extremity. There was tenderness over the lower lumbar spine.

Dr. Ronald P. Pawl, a neurosurgeon, saw claimant for the first time on July 29, 1986, at the request of Montgomery. Pawl's report stated:

"A detailed neurologic examination did not disclose any evidence of compromise of the central or peripheral nervous system. Deep tendon reflexes were symmetrical and active and there was no loss of strength in any of the muscle groups of the lower extremities and the range of motion of the joints of the extremities of the spinal column was normal. There was no specific area of palpable tenderness in the lower back. I discussed his exercise program with him and it is apparent that he is not exercising at a vigorous rate.

\* \* \*

Based upon the unusual complaints surrounding Mr. Powers' back pain and the possibility of a herniated disc based on the CT scan, I think that he should undergo not only myelographic investigation with post-myelographic CT scanning but also an evaluation by a comprehensive pain treatment center team. If there is a significant organic stenosis of the spinal canal caus-

ing compromise of the nerve roots, then some form of intervention or restriction of activities may be necessary. On the other hand, if his evaluation by the chronic pain management team indicates that he has a chronic pain syndrome then rehabilitation should proceed along non-surgical lines especially in view of his normal neurologic examination and lack of root entrapment signs."

Petitioner was seen by Dr. Robert A. Miller in October 1986. Miller found that claimant had a spondylolysis with spondylolisthesis and that there was evidence of a slightly herniated disc at L4-L5. Miller's report dated October 17, 1986, stated that claimant continued

"to have mechanical low back pain despite external support. He is currently unable to return to his previous occupation. Physical exam revealed a mild amount of paraspinal muscle spasm and back tenderness with a limitation of range of motion of the low back. His range of motion measured 75 degrees [in] forward flexion, backward flexion approximately 5 degrees and lateral flexion of 15 degrees bilaterally. Ely and Gaensler tests are positive and he has a mildly positive straight leg raising test at about 75 degrees bilaterally. X rays confirmed the presence of a disc space narrowing at L4-L5 level indicating degenerative disc disease."

Claimant testified he had not worked since May 23, 1986. Claimant presented evidence of medical bills totalling $2,861. These exhibits were admitted over respondent's objections.

The arbitrator awarded TTD from February 3, 1986, through May 1, 1986, and from May 23, 1986, to the date of hearing, November 10, 1986. The arbitrator found Montgomery's impression was a "herniation of lumbar discs, L4-5"; Pawl's report was evidence "suggestive of a herniated disc with possible root entrapment"; Miller indicated "a herniated disc at L4-L5 and spondylolysis with spondylolisthesis" and "currently unable to return to his previous occupation"; and Lambur diagnosed "a disc herniation at L-4 and L-5 with bilateral spondylolysis at L-5." The March 25, 1987, decision of the Commission noted that Lambur's September 16, 1986, statement to claimant that he was unable to justify claimant being off work since February 1986 was against all other medical evidence and adopted all the findings which were included in the arbitrator's November 20, 1986, decision. The arbitrator's decision found total reasonable and necessary medical, surgical, and hospital bills or services to be $2,861 and that claimant was entitled to TTD of 36⁶/₇ weeks from February 3 to November 10, 1986.

■ TTD involves that temporary period immediately following an accident during which the injured employee is totally incapacitated by reason of the injury, and it is considered temporary in the sense that the disabling condition exists until the employee is as far restored as the injury's permanent character will permit. (*Mt. Olive Coal Co. v. Industrial Comm'n* (1920), 295 Ill. 429, 431, 129 N.E. 103, 104.) In order to recover TTD benefits, a claimant must prove, by a preponderance of the evidence, that the injuries arose out of and in the course of his employment (*Lyons v. Industrial Comm'n* (1983), 96 Ill. 2d 198, 203, 449 N.E.2d 1323, 1325), and that claimant had a resultant incapacity to work. (See *Pemble v. Industrial Comm'n* (1989), 181 Ill. App. 3d 409, 416, 536 N.E.2d 1349, 1354.) Claimant must prove not only that he did not work, but that he was unable to work. *Gallentine v. Industrial Comm'n* (1990), 201 Ill. App. 3d 880, 887, 559 N.E.2d 526, 531; *Palmer House v. Industrial Comm'n* (1990), 200 Ill. App. 3d 558, 564, 558 N.E.2d 285, 289.

■ Under section 8(a) of the Act, an employee is only entitled to recover reasonable medical expenses which are causally related to the accident. The award should only reflect those services which were determined to be required to diagnose, relieve, or cure the effects of claimant's injury. (*Palmer House*, 200 Ill. App. 3d at 565, 558 N.E.2d at 290.) What is reasonable and necessary is a question of fact to be determined on a case-by-case basis. The award of $2,861 medical expenses was not against the manifest weight of the evidence.

Both parties agree that it is the Commission's function to determine facts and draw reasonable inferences from the competent evidence in the record, while the reviewing court is limited to a consideration of whether the Commission's findings are against the manifest weight of the evidence. (*Granite City Steel Co. v. Industrial Comm'n* (1983), 97 Ill. 2d 402, 406, 454 N.E.2d 1011, 1013; *Scott v. Industrial Comm'n* (1979), 76 Ill. 2d 183, 184-85, 390 N.E.2d 906, 907; *Overland Construction Co. v. Industrial Comm'n* (1967), 37 Ill. 2d 525, 531, 229 N.E.2d 500, 504.) Merely because different inferences could be drawn from the conflicting evidence does not justify the reviewing court in overturning the Commission's decision. *Niles Police Department v. Industrial Comm'n* (1981), 83 Ill. 2d 528, 533-34, 416 N.E.2d 243, 245.

Because the arbitrator did not err in his rulings on November 10, 1986, the testimony of Krejnik is not considered in determining the appropriateness of the TTD award. If the arbitrator and Commission had second thoughts about the credibility of claimant, that question will be a part of future proceedings in this case.

■■ Based on the evidence summarized above, the findings of the March 25, 1987, Commission decision are not contrary to the manifest weight of the evidence. Accordingly, the judgment of the circuit court confirming the February 9, 1990, Commission decision is reversed, and the March 25, 1987, Commission decision is reinstated and confirmed.

Circuit court reversed; March 25, 1987, decision of the Illinois Industrial Commission reinstated and confirmed.

RAKOWSKI, WOODWARD, STOUDER and H. LEWIS, JJ., concur.