KIEFFER AND COMPANY, INC., Appellant, v. THE INDUSTRIAL COMMISSION *et al.* (Catherine Spomer, Widow of Walter P. Spomer, Deceased, Appellee).—WALTER P. SPOMER, Deceased, Appellant, v. THE INDUSTRIAL COMMISSION *et al.* (Kieffer and Company, Inc., Appellee).

Second District (Industrial Commission Division) Nos. 2—93—0232WC, 2—93—0253WC cons.

Opinion filed June 14, 1994.

RARICK, J., concurring in part and dissenting in part.

James R. Clune, of Sweeney & Riman, Ltd., of Chicago, for Kieffer and Company, Inc.

Thomas R. Lichten, of Chicago, for Catherine Spomer.

JUSTICE WOODWARD delivered the opinion of the court:

This is a consolidated appeal. In No. 87—WC—36594 (first case), on September 22, 1987, Walter P. Spomer (decedent), a retired neon tube bender, filed an application for adjustment of claim pursuant to the Workers' Occupational Diseases Act (Act) (Ill. Rev. Stat. 1987, ch. 48, par. 172.36 *et seq.* (now 820 ILCS 310/1 *et seq.* (West 1992))). Therein he alleged injuries to his lungs arising out of and in the course of his employment. Decedent filed a petition for immediate hearing pursuant to section 19(b)—1) of the Workers' Compensation Act (Ill. Rev. Stat. 1987, ch. 48, par. 138.19(b)—1) (now 820 ILCS 305/ 19(b)—1) (West 1992))). The primary issue in this first case was the extent of decedent's temporary total disability (TTD). During the pendency of this case, decedent died on June 20, 1988. The parties submitted a request for hearing on the first case 11 months after decedent's death.

On August 4, 1988, Catherine Spomer, the widow of decedent (claimant), filed an application for adjustment of claim under case No. 88—WC—34704 (second case). Claimant submitted a request for hearing form in the second case on September 4, 1989.

Both cases arose from the same factual situation and were heard together on September 14, 1989, by the arbitrator. The cases involved the same disputed issues, except for the additional issues of burial expenses and the employment relationship raised in the second case.

In the first case, the arbitrator found that decedent's cause of action under the Act terminated when he died on June 20, 1988. The Commission affirmed this decision, emphasizing that claimant had failed to prove decedent's inability to perform any job in a stable labor market.

In the second case, the arbitrator found that, as a result of the

decedent's exposure to an occupational disease arising out of and in the course of his employment, claimant was entitled to $62,499.91 in medical expenses, $441.25 a week for 20 years, commencing on June 20, 1988 (decedent's date of death), and $1,150 for burial expenses. The Commission affirmed the arbitrator's decision and further found that claimant failed to prove she was entitled to penalties or attorney fees under section 19(k), 19(l) or 16, respectively, of the Workers' Compensation Act (Ill. Rev. Stat. 1989, ch. 48, pars. 138.19(k), (l), 16 (now codified, as amended, at 820 ILCS 305/19(k), (l), 16 (West 1992))). The circuit court confirmed the Commission's decisions, and these timely appeals followed.

In the first case, claimant argues that the Commission's denial of TTD benefits is against the manifest weight of the evidence. In the second case, the employer contends that the Commission erred in finding that decedent was exposed to an occupational disease and that there was a causal relationship between decedent's employment and his condition of ill-being.

At the arbitration hearing, the following evidence was adduced. At the time of decedent's April 21, 1988, evidentiary deposition, he was 59 years old. He had been employed as a neon tube bender for close to 40 years. Decedent worked for Breliant Sign Company between 1945 and 1948, and Federal Sign & Signal Company from 1948 to 1958. Nu-Lite Sign Company was the decedent's employer for the next 20 years. The instant employer hired decedent in 1980, and he continued working for the employer until his voluntary retirement on June 20, 1985. None of the employers had any significant ventilation other than an open door, a ceiling fan, and/or an air conditioner.

The decedent's job duties as a neon tube bender included ordering glass, ballasts, transformers, and asbestos paper, which came in a 50-pound roll that usually lasted six months. Decedent would cut paper from this roll and melt glass tubing with a gas burner until it was soft and pliable. The glass was placed on top of a pattern that was laid on asbestos paper, which was usually a Johns Manville brand. After this process was completed, fibers from the asbestos paper would burn off and emit dust particles into the air. The decedent then placed the hot glass in a 16-inch by 6-foot rubber hose surrounded by a 2.5-inch by 6-inch asbestos block in order to bend the tubing into the shape of the pattern.

Decedent was responsible for keeping his work area clean. He swept up the asbestos dust and placed it in the trash. He noticed that his clothing was covered with a white ashy substance at the end of each day. Decedent did not wear any protective devices that would

inhibit the inhalation of asbestos particles. None of his employers required him to take any precautionary measures.

Decedent testified that, during the five years he worked for the employer, he was its only neon tube bender. Decedent was on an eight-hour-a-day shift but went to a 10-hour workday at the suggestion of the owner, Steve Kieffer. Decedent used asbestos paper on a daily basis but acknowledged that, for a brief time, he used rubber-based or fiber glass materials for a small percentage of the sign jobs. These methods were discarded because they did not work well.

Shortly after decedent's voluntary retirement, he developed a mild cough. He subsequently moved to Rapid River, Michigan, where he regularly fished and hunted. In May 1987, noticing problems with his right shoulder and arm, decedent went to Dr. Thomas Richards, an osteopath. Dr. Richards' examination revealed an abnormal sound in his shoulder. He took X rays of decedent's right shoulder which showed mild degenerative changes in the shoulder with densities in the right apex of the chest. Dr. Richards subsequently advised decedent that there was an abnormality in his right lung.

In July 1987, decedent sought care from Dr. Steven Dosh, who ordered further diagnostic testing at St. Francis Hospital. Dr. Mano Nunez, a radiologist, concluded that decedent's chest X rays revealed either a mesothelioma with several implants or metastatic involvement of the pleura. Dr. Dosh believed the decedent's lung condition represented a right chest mesothelioma with possible branchioplexopathy.

Dr. Dosh sent decedent to Dr. Curtis Marder for a second opinion about an open pleural biopsy at Marquette General Hospital (MGH). Dr. Marder wanted Dr. Arthur F. Saari, a board-certified internist whose specialty was pulmonary medicine, to consult on decedent's case. Dr. Saari testified by evidentiary deposition that he had previous experience in treating occupational mesothelioma that was related to asbestos exposure. He acknowledged that this condition was hard to treat and estimated that the life expectancy for a mesothelioma patient would be 1½ to 2 years after onset. Dr. Saari was initially unable to render a firm diagnosis of decedent's lung mass. He suggested decedent undergo a bronchoscopy, thoracentesis, and an open biopsy of the pleura to rule out central adenocarcinoma of the lung with pleural metastases or a multifocal malignant tumor. Dr. Saari recommended that decedent be examined by the staff oncologists at MGH, as well as a major oncology facility, to decide on his treatment options. Dr. Saari admitted that even if surgery was pursued, the result would not necessarily cure decedent's condition.

Dr. Saari reviewed the results of the various procedures and still was unable to determine the status of decedent's lung condition. He conferred with Dr. Marder and Dr. Hunter, a University of Michigan Hospital oncologist. He then decided that decedent should undergo a thoracotomy and a decortication of the right lung with an Apical wedge resection of the right upper lobe and a pleurectomy. Tests confirmed an alignment neoplasm of the pleura, which was probably malignant.

Dr. Randolph E. Smith of MGH's pathology department concluded that decedent had a mesothelioma. Some of his colleagues did not fully agree with him. Dr. Smith sent slides and a paraffin block of the pleural tumor to Dr. Thomas V. Colby, a pathologist at St. Mary's Hospital of the Mayo Clinic. Dr. Colby and Dr. Lou Weiland were unable to assess decedent's lung condition. Dr. Colby noted that there was evidence of asbestos exposure in the form of hyaline pleural plaques. He believed that this finding, along with decedent's work history and the pleural tumor, strongly pointed to a mesothelioma. Dr. Colby acknowledged that decedent's lung condition had an unusual histology and clinical presentation, which made it difficult for him to diagnose definitively a malignant mesothelioma. Dr. Weiland thought decedent might have a malignant histiocytic tumor. Both of these physicians suggested that decedent's tumor slides be sent to the United States-Canadian mesothelioma panel for further evaluation. Six of the eight reviewers of the panel subsequently opined that the neoplasm was probably a mesothelioma.

Dr. Saari discharged claimant on August 14, 1987, with the diagnosis of a malignant mesothelioma, rather than an undifferentiated carcinoma. Dr. Marder agreed with Dr. Saari's opinion but noted there was some controversy over the exact nature of decedent's tumor.

Decedent underwent radiation treatment in August 1987 and September 1987. He eventually developed right chest complaints and underwent a bone scan in November 1987. Dr. Shah thought this problem was secondary to decedent's gallbladder cholecystitis. In March 1988, decedent underwent a cholecystectomy (surgical removal of the gallbladder) because he suffered recurring abdominal pain.

Decedent experienced increasing dyspnea, a cough with congestion, chills, and nocturnal sweating with some nausea. On May 24, 1988, decedent went to the emergency room of MGH, where Dr. C.F. Hammerstrom diagnosed pneumonia of the right middle and lower lobes and mild congestive heart failure. Dr. Thomas D. LeGalley concluded that decedent had malignant pericardial effusion second-

ary to the extension of a mesothelioma. Dr. LeGalley attributed some of decedent's dyspnea to these problems. Decedent was provided with conservative care; he was given a poor prognosis. Dr. LeGalley discussed the possibility of placement of a pericardial window with Dr. Marder. Dr. Marder agreed with Dr. LeGalley's diagnosis, which he considered as a normal complication of mesothelioma. Dr. Marder warned the decedent that there were significant risks to the operation proposed by Dr. LeGalley and stressed that this procedure might not offer him any improvement. Dr. Marder used a subxiphoid approach in the surgery performed on June 1, 1988.

Dr. C.F. Hammerstrom of MGH noted that decedent suffered from malignant mesothelioma metastatic to the pericardium and heart and respiratory failure due to restrictive lung disease and congestive heart failure. Initially, there was limited improvement of decedent's condition. He remained hospitalized until June 20, 1988, when he died of asystole. Dr. Hammerstrom attributed his death to myocardial involvement and respiratory insufficiency, which was caused by a malignant mesothelioma.

Decedent smoked a pipe five times a day for 20 years between 1967 and 1987. Decedent denied inhaling any pipe smoke during this period or ever smoking cigarettes or cigars. He testified that he had never been in the military or on any navy ships or been exposed to any building demolition. Decedent had not worked for any roofing, refrigeration, or insulation concerns, nor had he ever worked in a power plant. He had done some excavating and plumbing work for Melrose Park Plumbing in 1950. Decedent claimed that he always lived in residential areas that were not in close proximity to steel mills, refineries, or chemical plants.

We first address claimant's argument that, in the first case, the Commission erred in denying TTD benefits for the period of May 27, 1987, to June 20, 1988. Claimant maintains that the evidence supports a finding of TTD. The employer asserts that decedent's testimony serves to negate his eligibility for TTD benefits.

The claimant bears the burden of proving all the elements of his case, including the extent and permanency of injury, in order to recover benefits. (*Ingalls Memorial Hospital v. Industrial Comm'n* (1993), 241 Ill. App. 3d 710.) In order to recover TTD benefits, a claimant must prove by a preponderance of the evidence that the injuries arose out of and in the course of his employment and that claimant had a resultant incapacity to work. (*University of Illinois v. Industrial Comm'n* (1992), 232 Ill. App. 3d 154.) Further, claimant must prove not only that he did not work, but that he was unable to work. *University of Illinois*, 232 Ill. App. 3d at 164.

It is axiomatic that the Commission's decisions on disputed factual matters will not be overturned by a reviewing court unless they are against the manifest weight of the evidence. *Bailey v. Industrial Comm'n* (1993), 247 Ill. App. 3d 204, 209.

Decedent voluntarily retired in June 1985. He moved to Michigan's upper peninsula, where he hunted and fished on a regular basis. He made no attempt to find employment. Decedent first went to see Dr. Thomas Richards on May 27, 1987, for pain in his right arm and shoulder. After seeing a number of physicians in August 1987, decedent underwent chest surgery and radiation therapy. The once-a-day radiation treatment concluded on September 22, 1987. Decedent took Tylenol 3 for pain relief. Decedent underwent surgery for the removal of his gallbladder on March 2, 1988. He felt weak following this surgical procedure but started to gain strength three or four weeks after it.

Decedent testified that during the latter part of 1987 and in the early months of 1988 he continued to hunt and fish. During those months, he did not take care of the yard and the house, as he had previously done. Late in May 1988, decedent was admitted to the hospital, complaining of dyspnea and other symptoms. His health continued to deteriorate, and, on June 20, 1988, he died.

Dr. Saari first saw decedent on July 23, 1987. After reviewing X rays, he recommended that decedent undergo surgery to debulk decedent's lung tumor. He did not perform the surgery in August 1987, nor did he ever again see decedent in his professional capacity. Regarding decedent's ability to work in the disputed months, Dr. Saari gave the following testimony:

"Q. [Could decedent perform] any gainful activity?

A. I suspect there are types of gainful employment that he could have been able to perform. However a person who has a painful tumor that's going to require several weeks of radiation therapy that's rather inconvenient to a work schedule is probably not going to be able to work reliably at any specific job. He would be further limited by the fatiguing effects of radiation therapy, which are fairly prominent, and, further, psychologically, I suspect that a fifty-eight year old gentleman who has been diagnosed with a tumor that's going to likely take his life in a very brief interval of time is not going to be psychologically well adapted to working."

In its decision regarding the first case, the Commission wrote in relevant part:

"[W]hile [decedent] was exposed to toxic substances that caused an occupational disease, he failed to prove that he sustained any temporary total disability as the result of this exposure. The

Commission finds that [decedent] voluntarily removed himself from the employment market on June 20, 1985 and testified that he didn't look for any work after that date. [Decedent] failed to prove that he was not able to perform any job in a stable labor market."

■ Admittedly, the evidence is closely balanced as to decedent's capacity to work in the year prior to his death. Dr. Saari did not rule out decedent's ability to perform some type of employment during the subject period. Decedent testified that as late as April 22, 1988, he was still hunting and fishing. It was for the Commission to weigh the contradictory evidence before it. Its decision is not against the manifest weight of the evidence.

Further, we find the case primarily relied upon by claimant, *General Steel Industries v. Industrial Comm'n* (1971), 49 Ill. 2d 552, to be factually dissimilar. *General Steel* did not involve a post-retirement TTD issue but instead dealt with permanent and total disability arising after retirement. As such, it provides negligible guidance on this particular issue.

Claimant also argues that the Commission's statement that decedent's death extinguished his rights to any claim under the Act is contrary to law and is an improper basis upon which to deny benefits. It is evident upon reviewing the Commission's decision in its entirety that it did not rely on the claimant's failure to amend properly the application for adjustment of claim as the basis for denying TTD benefits. Instead, the Commission weighed the evidence before it and found that claimant had not proved her case in regard to TTD benefits.

We next address the employer's appeal, which arises from the second case. It argues that claimant failed to prove decedent's exposure to an occupational disease and that claimant failed to prove a causal relationship between his employment and his condition of ill-being.

As to the alleged failure to prove decedent's exposure to an occupational disease, the employer contends that decedent's deposition testimony regarding his use of asbestos paper was contradictory. Claimant argues that, with the exception of one small contradiction, decedent's testimony regarding his exposure to asbestos while working for the employer was consistent.

A review of decedent's testimony reveals the following pertinent information:

"Q. When did you first see such a [Johns Manville] label on the asbestos paper, as best you can recall?

A. Probably 20 years ago. You know, all the years that we

worked in the sign business, we had that same *** label *** on there.

Q. Was it the same up through 1985?

* * *

A. Yes, as far as I can recall.

* * *

Q. When did you last use this asbestos paper?

A. Until the day I retired in '85."

Later, on cross-examination, decedent testified as follows:

"Q. From 1945 until when, did you continue to use that orange and blue Johns Manville paper ***?

A. I would say til the 1980's.

Q. Would it be safe to say in 1980, '81 or '82?

A. Probably '80."

On redirect examination, the following testimony took place:

"Q. When did you last use the asbestos paper that you testified that came in a roll with [sic] orange and blue Johns Manville asbestos paper label on it?

A. Oh, that same week. That same week I retired, June—June of '85."

Decedent's testimony regarding this matter was somewhat contradictory. Nevertheless, the Commission could have properly inferred from these statements that his last day of exposure to asbestos occurred in June 1985.

Next, the employer argues that the Commission erred in finding a causal relationship between decedent's condition of ill-being and his employment. The employer emphasizes that Dr. Saari testified that the generally accepted latency period of a mesothelioma was approximately 20 years. He also acknowledged that it is unknown whether any further exposure to the carcinogen makes any difference in the mesothelioma's progression. Thus, the employer asserts there can be no evidence that decedent's mesothelioma was caused by his exposure to asbestos while working for the employer from 1980 to 1985. In response, claimant contends that the evidence clearly supports the Commission's decision as to a causal connection.

Section 1(d) of the Act reads in pertinent part:

"In this Act the term 'Occupational Disease' means a disease arising out of and in the course of the employment or which has become aggravated and rendered disabling as a result of the exposure of the employment. Such aggravation shall arise out of a risk peculiar to or increased by the employment and not common to the general public.

A disease shall be deemed to arise out of the employment if there is apparent to the rational mind, upon consideration of all

the circumstances, a causal connection between the conditions under which the work is performed and the occupational disease. The disease need not to have been foreseen or expected but after its contraction it must appear to have had its origin or aggravation in a risk connected with the employment and to have flowed from that source as a rational consequence.

An employee shall be conclusively deemed to have been exposed to the hazards of an occupational disease when, for any length of time however short, he or she is employed in an occupation or process in which the hazard of the disease exists ***." Ill. Rev. Stat. 1989, ch. 48, par. 172.36(d) (now 820 ILCS 310/1(d) (West 1992)).

■ Initially, we find that the record clearly demonstrates that decedent was continuously exposed to asbestos throughout his employment career, including the final five years with this employer, and that this exposure to asbestos caused decedent's condition of ill-being. Though there was some disagreement concerning the exact diagnosis of decedent's condition, most of the physicians involved agreed that he suffered from mesothelioma. Dr. Saari, decedent's treating pulmonary specialist, thought that decedent's condition was related to his employment. This view was based on his extensive experience dealing with patients who had significant exposure to asbestos, as well as numerous medical studies, which found a strong association between workplace exposure to asbestos and the development of mesothelioma. Dr. Saari further based his opinion on decedent's history, the majority opinion of the United States-Canadian mesothelioma panel, and his own clinical findings. Though he was aware that decedent smoked a pipe for 20 years, Dr. Saari ruled out any other cause of decedent's lung condition.

Moreover, the notes of Drs. Marder, LeGalley, and Hammerstrom concurred that decedent's heart and respiratory failure were attributable to his mesothelioma and that a combination of these conditions caused decedent's death.

Further, section 1(d) of the Act states in relevant part:

"The employer liable for the compensation in this Act provided shall be the employer in whose employment the employee was last exposed to the hazard of the occupational disease claimed upon regardless of the length of time of such last exposure ***." (Ill. Rev. Stat. 1987, ch. 48, par. 172.36(d) (now 820 ILCS 310/1(d) (West 1992)).)

The evidence before us demonstrates that the employer was decedent's last employer. Under the Act, the employer is liable to pay the awarded benefits and medical costs. See *H&H Plumbing Co. v. Industrial Comm'n* (1988), 170 Ill. App. 3d 706.

Given the record before us, we conclude that the Commission's decision concerning causal connection was not against the manifest weight of the evidence.

■ Finally, in what amounts to a cross-appeal, claimant raises two arguments, namely, that section 1(f) of the Act is unconstitutional and that the Commission erred in refusing to award her penalties and attorney fees. The record does not contain any document(s) pertaining to a cross-appeal. As a result, we find that these issues raised by claimant are not properly before this court and, therefore, will not be addressed. 134 Ill. 2d R. 303(a)(3).

For reasons stated above, we affirm the judgments of the circuit court.

Affirmed.

McCULLOUGH, P.J., and RAKOWSKI and SLATER, JJ., concur.

JUSTICE RARICK, concurring in part and dissenting in part:

Because I believe claimant sufficiently proved his inability to perform any job in a stable labor market in the year prior to his death, I dissent from that portion of the majority's opinion pertaining to temporary total disability benefits. I otherwise concur.

The evidence reveals that during the period from the diagnosis of his illness to his death claimant underwent several surgical procedures, lengthy hospital stays, and daily radiation therapy. The fact that during stable periods claimant occasionally was able to engage in fishing and hunting activities does not mean he was capable of pursuing and carrying out gainful employment. (See *E.R. Moore Co. v. Industrial Comm'n* (1978), 71 Ill. 2d 353.) Claimant often was weak, needed numerous pain pills on a daily basis, and no longer was able to take care of his house and yard. As claimant's physician commented, certainly claimant's state of mind during this time period would not have been conducive to effective employment. I therefore would award temporary total disability benefits in addition to those benefits awarded by the majority to claimant's widow.